**O'TOOLE et al. v. UNITED STATES et al.**

No. 10915.

United States Court of Appeals
Third Circuit.

Argued March 19, 1953.

Decided Aug. 10, 1953.

Januar D. Bove, Jr., and Arthur G. Connolly, Wilmington, Del., for all appellants except Robert J. Wilson.

Herbert L. Cobin, Wilmington, Del. (William H. Foulk, Wilmington, Del., on the brief), for appellant Robert J. Wilson.

Stanley Rose, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Department of Justice, Washington, D. C., William Marvel, U. S. Atty., Wilmington, Del., Massillon M. Heuser, Atty., Department of Justice, Washington, D. C., Lieutenant Charles P. Moriarty, Jr., Judge Advocate General's Corps, Department of the Army, Washington, D. C., on the brief), for United States of America.

James R. Morford, Wilmington, Del. (Morford, Bennethum and Marvel, Wilmington, Del., Vernon E. West, Chester H. Gray, and Oliver Gasch, Washington, D. C., on the brief), for District of Columbia.

Before BIGGS, Chief Judge, and MARIS and GOODRICH, Circuit Judges.

BIGGS, Chief Judge.

The principal question presented by this appeal is which, if either, of the defendants may be charged with responsibility for the torts of the District of Columbia

National Guard committed during peacetime training at a time when the District of Columbia National Guard had not been ordered to active service as a component of the United States Army.

The facts alleged in the amended complaint are as follows. On July 9, 1950, Charlotte M. O'Toole and Thomas B. O'Toole, her husband, were passengers in an automobile owned by Thomas B. O'Toole and being driven north on Route 14 in Delaware by Robert J. Wilson. Heading south on the same route was a unit of the District of Columbia National Guard which included two M–4 tractors. The first tractor was being driven by Sergeant James Francis Griggs, and the second, which was directly behind the first, by Pfc. Melvin L. Harrington. At a point about five miles south of Milford, Delaware, Griggs' tractor proceeded to a stop on the right hand side of the road. Harrington's tractor thereupon crossed the highway just as the O'Toole car was approaching. The car and Harrington's tractor collided, killing Mr. O'Toole, seriously injuring Mrs. O'Toole and Wilson, and damaging the automobile. The complaint alleged that Harrington was "the agent, servant or employee of the United States of America and of the District of Columbia and was acting within the scope of his employment or office," and that the M–4 tractor was being "driven, operated or maintained in a negligent and unsafe manner."

The plaintiffs Charlotte M. O'Toole and Robert J. Wilson brought suit in their own names. Charlotte M. O'Toole also sued as administratrix of her husband's estate. The corporate plaintiff, St. Paul Fire and Marine Insurance Company, sued as subrogee to Thomas B. O'Toole's right of recovery for damage to the automobile. Suit against the United States was based upon the Federal Tort Claims Act, 28 U.S.C. §§ 2674, 1346(b). Although the complaint is not entirely clear as to the basis of suit against the District of Columbia, we will regard this suit as based upon diversity of citizenship and amount in controversy. Service of process on the District of Columbia was made in accordance with the Delaware nonresident motorist statute, Re-

vised Code of Delaware, 1935, § 4590. Notice of suit was also mailed to the District of Columbia pursuant to D.C.Code § 12–208 (1940 ed.).

Interrogatories and answers to them were filed, establishing and supplementing the facts alleged in the complaint except for the alleged negligence. The District of Columbia moved to dismiss the actions or to quash the return of service of summons on several grounds, among them that the District was not amenable to service under the Delaware nonresident motorist statute, that the District did not own, operate or control Harrington's M–4 tractor, that the court lacked jurisdiction and that the venue was improper. The United States moved for summary judgment on the ground that the cause of action alleged was not "based upon the negligence or wrongful act or omission of any employee of the United States while acting in the scope of his employment, as required to give jurisdiction to this Court under the Federal Tort Claims Act." Various affidavits were filed in support of and in opposition to this motion.

The District Court granted the motions of both defendants. See 106 F.Supp. 804 (D.Del.1952). The court held that Harrington and Griggs were not employees of the United States within the meaning of the Federal Tort Claims Act, and that the District of Columbia was not subject to service of process under the Delaware nonresident motorist statute. As additional grounds for dismissing the action as to the District of Columbia the court held that the venue was improper and that, if the suit should be considered as based upon the Federal Tort Claims Act, the District of Columbia was not covered by that Act in its present form. The plaintiffs appeal.

We will address ourselves solely to the question of responsibility for the torts of the District of Columbia National Guard. We do not consider it necessary to deal with the manifold other problems presented to the court below. Thus, we do not decide whether the District of Columbia is itself an agency of the United States within the meaning of the Federal Tort Claims Act. Nor will we discuss whether

venue was properly laid in the court below as to the District of Columbia or whether the court had jurisdiction over the District by virtue of the Federal Rules of Civil Procedure, 28 U.S.C., the application of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, the Delaware nonresident motorist statute, or the District of Columbia Code, § 12–208, or finally the sovereign immunity, said to shield the District of Columbia from this suit. In our view our determination of responsibility for the alleged negligence in operating or maintaining Harrington's M–4 tractor determines this appeal. The present record is ample to enable us to make such a determination.

The liability of the United States under the Federal Tort Claims Act is spelled out in Sections 2674 and 1346(b) of Title 28 U.S.C. The former section provides that "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, * * *." The latter confers on the district courts exclusive jurisdiction of civil actions on claims against the United States, for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Was Harrington an employee of the "Government" acting within the scope of his employment? Section 2671 of Title 28 U.S.C., supplies the following definitions: " 'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons act-

ing on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation."

" 'Federal agency' includes the executive departments and independent establishment [sic] of the United States, and corporations primarily acting as, instrumentalities or agencies of the United States but does not include any contractor with the United States." And " 'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States, means acting in line of duty."

There is no doubt that Harrington was in the service of and performing the work of the District of Columbia National Guard at the time of the collision with the O'-Toole car. The summer training schedule of the Guard and the record of Harrington's participation in this training are before us. The disputed question is whether the Guard was in such a relation to the United States as to make Harrington an employee not only of the Guard but of the United States. It must be remembered in this connection that it is the peacetime status of the Guard with which we are concerned; the Guard had not been ordered into active service with the Army of the United States. See 48 Stat. 155 (1933), 32 U.S.C.A. § 4 et seq.; P.L. 476, 82d Cong., 2d Sess. (1952), 50 U.S.C.A. § 1111 et seq.

The peacetime status of the District of Columbia National Guard is described in various statutes as follows: The Guard, consisting of the organized militia of the District, was created by Act of Congress.[1] The President of the United States is its Commander-in-Chief.[2] He appoints the Guard's commanding general and may remove him at pleasure.[3] He also appoints the adjutant general of the Guard and the Guard's staff and other officers.[4] The

1. 25 Stat. 774, § 10 (1889), 35 Stat. 629, § 10 (1909), D.C.Code, Title 39 (1951 ed.).

2. 25 Stat. 773, § 6 (1889), D.C.Code, § 39–112 (1951 ed.).

3. 25 Stat. 773, § 7 (1889), D.C.Code, § 39–201 (1951 ed.).

4. 25 Stat. 773, § 8 (1889), 39 Stat. 199, § 66 (1916), D.C.Code, § 39–202 et seq. (1951 ed.). The President also appoints

President approves the regulations of the commanding general for the Guard.[5] He or the commanding general may appoint courts-martial for the Guard,[6] and he determines matters pertaining to the retirement of Guard officers.[7] In other matters not covered by law, the commanding general has the power of regulation, subject to the approval of the President.[8] Enlisted members of the Guard are required to swear that they " 'will obey the orders of the President of the United States, and of the officers appointed over [them] according to law * * *.' "[9]

It thus appears that there is a direct chain of control and command from the President through the Guard's commanding general to the enlisted members of the Guard. By the same token, control of the Guard by the District of Columbia is lacking. It is true that in the case of riot or other similar emergency the Commissioners of the District of Columbia may lawfully call on the Commander-in-Chief of the Guard, the President of the United States, to aid in suppressing the riot, but the Commander-in-Chief retains complete discretion as to how many and what troops are called out.[10] In no other situation is the Guard subject even to the request of the Commissioners. We therefore place little weight on the fact that certain items of Guard expenses, including administrative and maintenance expenses of head-

quarters and of local armory facilities within the District, are included in the District of Columbia appropriations.[11] The salary of the commanding general at the time of the accident here involved was paid directly by the Army, and, as in the case of the National Guards of the States and Territories, the bulk of the expenses of the summer training were borne by the United States. See 32 U.S.C.A. § 22.

That the District of Columbia National Guard is under the Federal Government rather than the District of Columbia has been recognized by those authorities who are presumably most familiar with Guard affairs. On January 26, 1949, President Truman issued Executive Order No. 10030 U. S. Code Cong. Service 1949, p. 2681, providing that "The Secretary of Defense is authorized and directed to supervise and control, on behalf of the President and through such official or officials of the National Military Establishment as the said Secretary shall designate, the administration of the affairs of the District of Columbia National Guard: Provided, that the foregoing provision shall not be effective whenever the said National Guard is in active Federal service or on active emergency duty in the District of Columbia after being ordered to such duty pursuant to law." Colonel Nevitt and General Cox, then officers of the Guard, testified to the effect of this order.[12] Colonel Nevitt stat-

the adjutants general for the National Guards of the Territories. See 32 U.S. C.A. § 12.

5. 25 Stat. 781, § 62 (1889), 35 Stat. 636, § 70 (1909), D.C.Code, § 39-905 (1951 ed.).

6. 25 Stat. 779, § 51 (1889), 35 Stat. 634, § 56 (1909), D.C.Code, § 39-703 (1951 ed.). The President may also convene general courts-martial for the peacetime National Guard of the States and Territories. See 32 U.S.C.A. § 92.

7. 35 Stat. 631, § 20 (1909), D.C.Code, § 39-213 (1951 ed.).

8. See note 5 supra.

9. 39 Stat. 201, § 70, as amended (1916), D.C.Code, § 39-402 (1951 ed.). A similar oath is prescribed for officers. See 32 U.S.C.A. § 112. This language is sub-

stantially the same as that required of officers and enlisted men of the National Guards of the States and Territories except that in the case of the States the man taking the oath swears also to obey the orders of the Governor of the State. District Guardsmen do not swear to obey orders of the Commissioners of the District of Columbia.

10. 25 Stat. 778, § 45 (1889), 35 Stat. 634, § 48 (1909), D.C.Code, § 39-603 (1951 ed.). In the instant case, of course, the summer training was not undertaken at the request of the Commissioners of the District of Columbia but upon the order of the commanding general.

11. 35 Stat. 636, § 66 (1909), D.C.Code, § 39-805 (1951 ed.).

12. Hearings before the Subcommittee of the Committee on Appropriations of the

ed: "As I read the Executive order, I see no material change in the operation of the National Guard of the District of Columbia, * * *." General Cox added: "Under the set-up in the District of Columbia, the National Guard is essentially a Federal force as against a State force in the States. The President is the only person who can call the National Guard out. * * * The Commissioners of the District of Columbia have no authority over the Guard. The authority extends to the handling of our budgetary requirements. In the States the Governor of the State is at the head of the National Guard except in cases of emergency, when the Guard is called in as a Federal force, but here the Guard is actually a Federal force." General Cox concluded that the President in the District of Columbia takes the place of the Governor in the individual State in controlling the National Guard. Two earlier Congressional reports had reached a similar conclusion.[13] The commanding general of the Guard at the time of the accident now before us has expressed the same opinion.[14]

Prior cases have referred to this problem, although the references may perhaps have been unnecessary to their holdings. Hurley v. United States ex rel. Gladman, 1931, 60 App.D.C. 39, 47 F.2d 431 at page 433, remarks: "The withdrawal of federal recognition to an officer of the National Guard of a state does not terminate his status as a state officer. Const. art. 1, § 8, cl. 16. *Here there is no intervening sovereignty.* The action of the De-

partment [terminating Gladman's status as a federally recognized officer of the District Guard] in substance and effect terminated the status of the relator as an officer of the District National Guard." [Emphasis added.] United States v. Holly, 10 Cir., 1951, 192 F.2d 221, holding that a "unit caretaker" attached in peacetime to a State National Guard is a federal employee within the Federal Tort Claims Act, stressed the control which federal authority exercised over him pursuant to law. See also United States v. Duncan, 5 Cir., 1952, 197 F.2d 233. We consider these cases as supporting our determination in the instant case.

We do not consider it necessary in deciding the instant case to disagree with those cases holding that a member of the National Guard of a State or Territory in peacetime is not within the definition of the Federal Tort Claims Act. See Glasgow v. United States, D.C.N.D.Ala., 1951, 95 F.Supp. 213; Williams v. United States, 10 Cir., 1951, 189 F.2d 607; Satcher v. United States, D.C.W.D.S.C.1952, 101 F. Supp. 919; Cosme v. United States, Cir. No. 5555 (Puerto Rico 1950, unreparted). But we think that the view of the United States and of the court below was mistaken in refusing to recognize the uniquely different position of the District of Columbia National Guard. This view relies for support on statutes which mention in a single clause "the National Guard of the several States, Territories, and the District of Columbia".[15] We have examined these statutes and conclude that they concern the sta-

House of Representatives on the District of Columbia Appropriation Bill for 1950, pp. 441–2. 81st Cong., 1st Sess. (1949).

13. H.R.Doc.No.860, p. 2. 61st Cong., 2d Sess. (1910). H.R.Rep.No.1584, p. 2, 80th Cong., 2d Sess. (1948).

14. Hearings before the Subcommittee of the Committee on Appropriations of the House of Representatives on the District of Columbia Appropriation Bill for 1951, pp. 667–8, 81st Cong., 2d Sess. (1950).

15. 32 U.S.C.A. § 4: "The National Guard of the United States is hereby established. It shall be a reserve component of the Army of the United States and shall consist of those federally recognized National Guard units * * * officers,

warrant officers, and enlisted members of the National Guard of the several States, Territories, and the District of Columbia, who shall have been appointed * * * Provided that the members of the National Guard of the United States shall not be in the active service of the United States except when ordered thereto in accordance with law, and, in time of peace, they shall be administered, armed, uniformed, equipped, and trained in their status as the National Guard of the several States, Territories, and the District of Columbia, as provided in this title * * *."

See also 32 U.S.C.A. § 20: "Officers of the National Guard of the United States, while not on active duty, shall not, by

tus and organization of the National Guard of the United States as a reserve component of the Army of the United States, without intending to affect or describe the "local" status of the National Guard units. We think it consistent to say that while the members of the District Guard are not federal employees by virtue of federal recognition of the Guard as a unit of the National Guard of the United States, they may be such, when not on "active service" with the National Guard of the United States, by virtue of the federal control and the presidential command exercised over them pursuant to the statutory authority set forth in this opinion. It seems clear that even in the case of the National Guard of the District of Columbia there will be considerable difference in status as a federal unit in peacetime and as a component of the regular army on active service. The statutory distinction[16] in the case of the District Guard is not meaningless.[17]

Other cases, to the effect that for some purposes employees of the District of Columbia are not employees of the United States, have no bearing on the status of members of the District of Columbia National Guard. See Donovan v. United States, 1886, 21 Ct.Cl. 120; Griffith v. Rudolph, 1924, 54 App.D.C. 350, 298 F. 672. District Guard members on summer training are not employees of the District of Columbia.

We therefore hold that Harrington was an employee of the United States within the Federal Tort Claims Act and that his M-4 tractor, which was admittedly owned by the United States and loaned to the District Guard, was maintained by the United States through the Guard. We need not decide whether the District of Columbia National Guard is best characterized as a "military force of the United States" or simply as a "federal agency" or "independent establishments of the United States."[18] We think it clear that it

reason solely of their appointments, oaths, commissions, or status as such, or any duties or functions performed or pay or allowances received as such, be held or deemed to be officers or employees of the United States, or persons holding any office of trust or profit or discharging any official function under or in connection with any department of the Government of the United States."
Cf. P.L. 476, § 709, 82d Cong., 2d Sess. (1952), 50 U.S.C.A. § 1111 et seq.

16. We refer particularly to 32 U.S.C.A. § 81: "When Congress shall have declared a national emergency * * * the President may, under such regulations * * * order into the active military service of the United States, to serve therein for the period of the war or emergency, unless sooner relieved, any or all units and the members thereof of the National Guard of the United States. All persons so ordered into the active military service of the United States from the date of such order stand relieved from duty in the National Guard of their respective States, Territories, and the District of Columbia so long as they shall remain in the active military service of the United States * * *."
See also 50 U.S.C.A. § 1122(b).

17. Compare the status of the Coast Guard which in peacetime is normally under the

Treasury Department, see 14 U.S.C.A. § 1, and in wartime becomes a part of the United States Navy. See 14 U.S.C.A. § 3. Under either provision the Coast Guard remains a federal agency.

It may be true that certain statutes pertaining to the District of Columbia National Guard inferentially contradict the conclusion which we have reached. E.g., 32 U.S.C.A. § 47. However, in view of the unequivocal language of the statutes giving the President control of the District Guard through its commanding general, we take the view that the draftsmen of these apparently conflicting statutes failed to give full regard to the unique position of the District Guard.

18. The United States cites Douffas v. Johnson, D.C.1949, 83 F.Supp. 644, 645 for the proposition that the District National Guard cannot be an agency or independent establishment of the United States within the definitions of the Federal Tort Claims Act. This case does not support this proposition. The basis of decision in Douffas was the failure of the plaintiff to sue the right party, the United States. The holding was that the Federal Tort Claims Act applies only to suits against the United States; suit against the District of Columbia was not compliance with the statute.

is within one of these terms although engaged in peacetime training. Our holding rests upon the degree of supervision and control exercised over the District Guard in peacetime by federal authorities.

As a final consideration on this aspect of the case, we note that the Federal Tort Claims Act admonishes us to equate the position of the United States to that of a private individual in like circumstances to determine whether there is liability. See Section 2674, Title 28 U.S.C. As was said by Judge Holtzoff of the United States District Court for the District of Columbia in Gilroy v. United States, 112 F.Supp. 664, 665, "The purpose of the Federal Tort Claims Act was to abrogate the immunity of the United States against suit in tort. Its purpose was to make the United States liable to suit in tort in the same manner as anyone else. Unlike other statutes waiving governmental immunity, the Federal Tort Claims Act should be liberally construed in order to effectuate the purpose that was intended by its framers. The words, 'as a private individual', are not used as words of art or as a limitation, but, rather, in a descriptive manner to indicate that the United States should be liable in the same manner and to the same extent as anyone else."

We think that if a private individual or organization in Delaware had possessed the degree of control over Harrington and the M-4 tractor—as to employment and discharge, discipline, direction and ownership—which has been given by statute to federal authority, there could be no question but that the individual or organization would be held responsible for any tort committed by Harrington in driving the tractor. See Grier v. Samuel, 1913, 4 Boyce 106, 86 A. 209; cf. Spence v. State, 1936, 159 Misc. 797, 288 N.Y.Supp. 1009.

We have held that the United States, the "Government", may be held to liability under the Federal Tort Claims Act in the instant case because of the measure of the control and command vested in the United States over the National Guard of the District of Columbia. By the same token, as we have previously stated, control of the Guard by the District of Columbia is lacking. This of necessity eliminates the District of Columbia as a defendant.

The judgment of the court below on the motion of the United States for summary judgment will be reversed and the case remanded for trial on the issue of negligence. The judgment of the court below dismissing the complaint as to the District of Columbia will be affirmed.