Charlotte M. O'TOOLE; Robert J. Wilson; Charlotte M. O'Toole, Administratrix of the Estate of Thomas B. O'Toole; and St. Paul Fire and Marine Insurance Company, a corporation of the State of Minnesota, Plaintiffs,

v.

The UNITED STATES of America and The District of Columbia, a corporation of the United States, Defendants.

Civ. A. No. 1343.

United States District Court
D. Delaware.

April 11, 1956.

---

Arthur G. Connolly and Januar D. Bove, Jr. (of Connolly, Cooch & Bove), Wilmington, Del., for all plaintiffs except Robert J. Wilson.

William H. Foulk and Herbert L. Cobin, Wilmington, Del., for plaintiff Robert J. Wilson.

Leonard G. Hagner, U. S. Atty., and H. Newton White, Asst. U. S. Atty., Wilmington, Del., for defendant.

LEAHY, Chief Judge.

Findings and Conclusions Under
Fed. Rules Civ. Proc. rule 52[*]

I find the facts specially:

### The Litigants

1. Plaintiffs, Charlotte M. O'Toole and Robert J. Wilson are residents of the State of Delaware.[1]

2. Mrs. O'Toole is the administratrix of the estate of Thomas B. O'Toole[2] and his widow.[3]

3. St. Paul Fire and Marine Insurance Company is a Minnesota corporation. On July 9, 1950, it had a $50 deductible automobile insurance policy on a Cadillac car owned by Thomas B. O'Toole. This car was involved in the collision to be described.[4]

4. The Court of Appeals has held, in this case, 3 Cir., 206 F.2d 912, that the members of the District of Columbia National Guard here involved were employees of the United States so as to make defendant liable under the Federal Tort Claims Act, Title 28 U.S.C.A. § 1346(b) and § 2674, for their negligence.

[*] This case falls into the orthodox pattern of a negligence cause involving death and injury of plaintiffs. All questions were purely factual. There were no real legal issues. In fact, negligence-liability was almost conceded by defendants. Hence, I concluded it inappropriate to write a memorandum opinion. I prefer to proceed under Federal Rule of Civil Procedure 52, 28 U.S.C.A.

1. PX 8, No. 1, p. 1.

2. PX 8, No. 6, p. 2.

3. PX 8, No. 2, p. 2; PX 12, p. 2, 53.

4. PX 8, No. 7, p. 3.

### Negligence

5. On July 9, 1950, at approximately 6:00 P. M.,[5] in a public highway (Route No. 14) at a point approximately 1,040 feet south of Route No. 224 and approximately 4.8 miles south of Milford, Delaware, Charlotte M. O'Toole and Thomas B. O'Toole, her husband, were passengers in a 1949 Cadillac automobile, owned by O'Toole. It was being driven in a northerly direction by plaintiff Robert J. Wilson.[6]

6. At the locus in question, an 18-ton M–4 tractor towing a 90–MM gun owned by the United States was being driven in a southerly direction by James Francis Griggs. Behind was an 18-ton M–4 tractor owned by the United States and being driven by Melvin Lee Harrington in the same direction.[7] Griggs and Harrington were members of Battery A, 260 A. A. A. Gun Battalion of the National Guard of the District of Columbia and were acting within the scope of their employment as such National Guardsmen.[8]

7. The soldiers were driving in a south-bound convoy.[9] The convoy vehicles were spread out,[10] but were "doing as they pleased", and were "running all rates of speed." [11] No officers were observed attempting to "close up" the convoy and some of the vehicles were going "plenty fast". Griggs and Harrington had left Washington, D. C., at 6:00 A. M. and had been driving twelve hours.[12] Harrington had had only twelve hours instruction in driving a tractor and had never driven in convoy before.[13]

8. July 9 was a Sunday and traffic from Rehoboth, Delaware, a seashore resort, was heavy.[14] The speed limit at the place described was 50 miles an hour; the paved portion of the roadway was 20 feet wide; and there were 8-foot shoulders on each side of it.[15] The weather was cloudy; visibility was good. The road was dry [16] and there was an excellent stretch of straight road.[17]

9. Cash (an eyewitness) was following about 200 feet behind the tractor then operated by Harrington which was behind the gun being towed by Griggs' tractor.[18] The two 18-ton tractors were traveling between 35 and 40 miles an hour.[19] There was not much space between the gun towed by Griggs and Harrington's tractor.[20] Cash had been passing other vehicles of the convoy and he was trying to pass Griggs and Harrington;[21] but he could not because of three cars headed northerly led by the O'Toole Cadillac.[22]

10. Warren (another eyewitness) was driving a 1935 Buick, had turned northerly into Route No. 14 about ½ mile from the point of the collision [23] and was traveling at a speed of between 35 and 40 miles an hour.[24] The O'Toole car passed him ¼ mile from the point of the collision [25] traveling at a speed of between 40 and 45 miles an hour; and prior to the collision had returned to its side of the center line of the road.[26]

11. Harrington noticed the tractor operated by Griggs with its gun-tow was slowing down and pulling onto the right or westerly shoulder of the road.[27]

5. R. 58.

6. PX 8, No. 2, p. 2.

7. PX 8, No. 3, p. 2.

8. PX 8, No. 4, p. 2.

9. R. 9, 10.

10. R. 10, 37.

11. R. 37.

12. PX 7; PX 8, No. 11, p. 4.

13. PX 7; PX 8, No. 10, p. 11.

14. R. 10, 359; PX 12, p. 24.

15. R. 62.

16. R. 75.

17. PX 3, 4, 5.

18. R. 9, 10.

19. R. 10, 11.

20. R. 11.

21. R. 10, 13.

22. R. 13, 14.

23. R. 25, 36.

24. R. 27.

25. R. 25, 43.

26. R. 14, 27, 44, 46, 50, 59, 91; PX 6, PX 12, p. 24.

27. PX 8, No. 19A, p. 5.

Griggs failed to give a signal or signals plainly audible or visible to the driver of such other vehicle as might be affected by his movement to the right shoulder of the road.[28]

12. Cash and Warren noticed some dust on the right shoulder of the road, made by either Griggs or Harrington.[29] At this time the front of the O'Toole car going north was even with the front of Harrington's south-bound tractor.[30] Harrington at first went over on the right or westerly shoulder,[31] but he was traveling too fast and too close to avoid hitting the gun towed by Griggs when Griggs started to stop.[32] To avoid hitting the gun, Harrington then pulled on the left clutch [33] and made a sudden 90-degree turn from the southerly lane into the northerly lane of traffic.[34]

13. Harrington did not see the O'Toole car until he had already started across the easterly half of the highway, onto the northbound lane.[35]

14. The front of the right tread of Harrington's 18-ton tractor hit the left front of the O'Toole car. The right tread went up over the hood of the O'Toole car, and came down in front of the front door post on the right side of the O'Toole car.[36]

15. The point of impact with reference to its location in the roadway was determined to be in the northbound lane of the highway approximately 3 feet east of the center line,[37] on the O'Toole side of the road. The O'Toole car was crushed where it was,[38] "just like a pancake".[39] The front end of the car was dragged easterly and onto the shoulder of the road.

16. The 18-ton tractor, after it crushed the O'Toole car, proceeded easterly across the road, off the shoulder of the northbound lane, down an embankment, into a field 20 feet from the paved portion of the road,[40] knocked down a pole,[41] and turned right and headed southerly, in the field and parallel to the road, another 100 to 200 feet before it could be brought to a stop.[42]

17. The O'Toole car was demolished.[43] The 18-ton tractor sustained only a paint scrape.[44] As a result of the collision, O'Toole was killed,[45] and Mrs. O'Toole and Wilson suffered severe injuries.[46]

### Mrs. O'Toole's Injuries

18. Before the collision, except for prior operations, including breast removal, from which she had recovered,[47] Mrs. O'Toole seldom sought a physician.[48] O'Toole's business required him to travel and entertain business associates extensively. Mrs. O'Toole invariably accompanied him and she "would be the hostess to give her company [sic] and see that the niceties were carried out".[49] Before the collision, she liked to entertain, enjoyed parties, motor boating, driving in an open car and "that type of thing." [50]

19. After the 18-ton tractor crushed the O'Toole car, Mrs. O'Toole was found in the back seat with the seat on her

28. PX 8, No. 19B, p. 6.

29. R. 20, 29.

30. R. 20.

31. R. 71, 77; PX 5, 6.

32. R. 40.

33. PX 7.

34. R. 20, 28, 50; PX 6, 7.

35. PX 8, No. 19D, p. 6.

36. R. 71, 75; PX 3, 4, 5.

37. R. 65; PX 6.

38. R. 15.

39. R. 33.

40. R. 28, 62; PX 6.

41. R. 15, 28, 50.

42. R. 15, 28, 62; PX 6.

43. R. 33, 69; PX 1.

44. R. 63; PX 2.

45. R. 31, 51, 60; PX 8, p. 4, No. 9.

46. R. 30–32, 51; PX 9, 10, 12, 13, 14.

47. PX 12, p. 10.

48. PX 12, p. 9.

49. R. 378, 482.

50. R. 379–80.

face "almost suffocated".[51] She was "moaning and she was covered with blood".[52] She was taken in an ambulance to the Milford Memorial Hospital emergency room in an unconscious state.[53] Her face was very swollen, and there was bleeding from one ear.[54]

20. The hospital record shows she suffered a head injury which was thought to be a fractured skull, but the X-ray was negative.[55] These records show also she suffered a compound fracture of the mandible, a compound fracture of the left elbow, a fracture of the ankle, an injury to the left knee and bruises.[56] This record[57] shows she suffered pain; also the treatments administered by the hospital staff and by Doctors Aitken, Gordy and Bailey; the latter two were specialists, summoned from Wilmington on the night of July 9 and early morning of July 10.[58] Her condition at the Milford Hospital was critical.[59] She was treated, *inter alia*, intravenously with plasma and other emergency medication.

21. Mrs. O'Toole remembers nothing from the time immediately preceding the collision until she was moved to the Delaware Hospital in Wilmington on July 11.[60]

22. The Delaware Hospital Records concerning Mrs. O'Toole[61] are complete. Page 2 of the personal history chart of the Delaware Hospital Record shows Mrs. O'Toole incurred "multiple injuries about the head, arms, body, legs as the result of auto accident on 7/9/50". Page 3 states she suffered multiple contusions. The eleven page "Order Chart" of the Dela-

ware Hospital Record[62] sets forth the various treatments and medication prescribed by the doctors.

23. The Daily Record Chart[63] kept by the nurses, who were special nurses with Mrs. O'Toole constantly during her hospitalization,[64] graphically describe her pain and suffering at the Delaware Hospital from July 11 until her discharge on August 23, 1950. The record contains almost daily references to the "excruciating pain" suffered by Mrs. O'Toole both generally and from specific injuries, despite prescribed sedation and other drugs.[65] The pain was especially severe because Mrs. O'Toole had a low pain tolerance.[66] This hospital record is replete with references to her hysteria and tears. The notation for July 29 shows she even cried in her sleep. As late as August 7, she complained of "pain in every part of body", and on August 17 of aches all over her body. It shows she was weak, nauseous and emotionally upset; she often had dizzy spells and fainted; and she could not move in bed.

24. The hospital record, on page 3 of the "Consultation Chart", shows a Doctor Johnson treated a hemorrhage of the right middle ear and a laceration in the canal floor caused by a jaw fracture, and that he removed some skin from the ear on August 7, 1950.[67] Mrs. O'Toole testified that she injured her right eye,[68] which was bloodshot.[69]

25. Mrs. O'Toole suffered a comminuted fracture of the three bones which make up the left elbow, the humerus, radius, and ulna.[70] The fracture was

51. R. 31.
52. R. 360.
53. R. 361.
54. PX 9, R. 362, 363.
55. PX 9.
56. PX 9.
57. PX 9.
58. R. 363.
59. R. 293.
60. PX 12, pp. 25–27.

61. PX 10.
62. PX 10.
63. A part of PX 10.
64. PX 12, p. 47; R. 364.
65. R. 219; PX 10.
66. R. 224.
67. See also PX 12, p. 30.
68. PX 12, p. 28.
69. R. 247.
70. R. 217.

extensive and there was derangement of the joint surface.[71] All three bones were splintered, fragmented and shattered, particularly the lower end of the humerus.[72] The diagnosis was confirmed by X-ray as shown by the hospital report.[73] Dr. Walter Bailey, an orthopedic surgeon, made the diagnosis and treated Mrs. O'Toole's elbow by skeletal traction, pulling a wire through the ulna bone and placing a weight on it. Dr. Bailey visited Mrs. O'Toole daily at the Delaware Hospital.[74]

26. Dr. Bailey also prescribed daily physical therapy, which was started at Mrs. O'Toole's home on September 5 and continued there until September 14.[75] From September 14 until October 31 these treatments continued three times a week at the doctor's office and from October 31, 1950, until May 14, 1951, the treatments were administered at the Delaware Curative Workshop.[76] Dr. Bailey's diagnosis and treatment were confirmed by Dr. Mather Cleveland, a specialist in New York City, to whom he referred Mrs. O'Toole, and by Dr. Anthony F. DePalma, Professor of Orthopedics at the Jefferson Medical School.[77]

27. Mrs. O'Toole has a 50 to 85 per cent permanent disability of the left arm and elbow.[78] On December 24, 1954, when Dr. Aitken last examined Mrs. O'Toole, he said she had a partial fixation of the left elbow with only about 15 per cent of motion.[79]

28. Dr. J. Paul Winthrop, a dental surgeon, examined Mrs. O'Toole at the Delaware Hospital on July 12 and observed she had a fracture of both sides of the mandible and multiple contused wounds about the mouth, lips, and chin.[80] The fractures were in the anterior part of the chin and in the right jaw joint.[81] He operated on the patient on July 18, 1950, at the hospital, after first having taken impressions and constructing plastic splints to utilize reduction of the fractures. The plastic splints were attached to the mandible by wires which were inserted from the exterior through the cheeks holding the patient's jaws in a rigid position.[82] These fractures are generally "quite painful".[83] Dr. Winthrop visited Mrs. O'Toole daily until August 16 and then three times during the following week.[84] After her discharge from the hospital, he made new dentures for her and saw her about ten additional times.

29. He examined her on March 8, 1955, and found she had only 40 per cent vertical movement and less than 50 per cent lateral movement of her jaw and only 10 per cent masticating efficiency.[85] Such patients are awkward, have great difficulty eating, and spill food from their mouths.[86] These injuries are permanent.[87]

30. Mrs. O'Toole's head injury, while at first thought to be a fracture of the skull,[88] was a traumatizing injury,[89] which proved to be a severe concussion of the brain.[90] The injury was so severe that Dr. Philip Gordy (a noted neurologic surgeon) was called to the Milford Hospital to examine her[91] and found it necessary to see her at the Delaware Hos-

71. R. 217.
72. R. 218.
73. PX 10.
74. R. 219.
75. R. 220.
76. R. 221.
77. R. 221, 298; PX 12, p. 28.
78. R. 222, 299–301; PX 12, p. 20.
79. R. 299–301.
80. R. 340.
81. R. 340.

82. R. 341.
83. R. 341.
84. R. 341.
85. R. 343.
86. R. 343–344.
87. R. 345.
88. PX 9.
89. R. 292.
90. R. 279, 292.
91. R. 292.

pital, to be certain no further complications developed, at first daily and then with decreasing frequency until the danger period was past.[92]

31. Mrs. O'Toole also had an undisplaced fracture of the lower end of the fibula in the left ankle.[93] She suffered a severe gash in the knee,[94] which has caused some stiffening of the leg,[95] and bruises, contusions, and lacerations all over her body.[96]

32. Mrs. O'Toole suffered a severe emotional upset [97] for which she was treated for at least three months after her discharge from the hospital.[98] This upset was characterized as on the edge of hysteria.[99] For a time she could not be told of her husband's death.[100] While the condition of verging on hysteria has improved, it is not completely gone,[101] recurs under slight stress,[102] and was obvious to Dr. Winthrop on March 8.[103]

33. After Mrs. O'Toole's discharge from the Delaware Hospital, in addition to the treatments and consultations already mentioned, Dr. Douglas Aitken continued to see her about three times a week for three months. The number of visits to his office by Mrs. O'Toole was gradually reduced to four checkups a year.[104] Her last visit to Dr. Aitken was on December 24, 1954.[105] At her home, Mrs. O'Toole had to have "round the clock" special nurses until early September, two nurses until Christmas of 1950, and for one year she had to have an attendant stay at her home all night to help her if necessary.[106]

34. As a result of these injuries, Mrs. O'Toole is a crippled invalid who seems to have withdrawn from the world in which she lives. She verges on hysteria at the slightest stress or strain.[107] A mere long distance phone call or a planned departure on a short trip causes her to become nervous and excited,[108] as does the mere presence of people.[109] She gets confused; her mind goes blank; she has memory difficulties; she feels hysterical; the slightest incident, such as a phone call, causes her to lose her voice; and she cannot control the obvious constant bobbing of her head.[110] She is fearful of motor cars.[111] Mrs. O'Toole's condition remains such she apparently was unable to testify at the trial. Both parties had to use her deposition taken by defendant.[112]

35. Her left arm "is just crippled, it is just held in a certain position", and "she doesn't use it".[113] She cannot dress or bathe without assistance or even pass things at table.[114] The arm and hand still pain her and the fingers feel numb.[115] When eating, she can't get food into her mouth;[116] after the food is in her mouth, she has trouble masticating and the food "spills" or "leaks out" of her mouth.[117]

92. R. 278.

93. R. 218; PX 9 and 10; PX 12, p. 30.

94. PX 12, p. 30; PX 9.

95. PX 12, p. 20 and p. 30.

96. R. 247, 340; PX 10; PX 12, pp. 30 and 31.

97. R. 294.

98. R. 296.

99. R. 296.

100. R. 297.

101. R. 297.

102. R. 298.

103. R. 342.

104. PX 12, p. 20.

105. R. 299.

106. R. 365–366.

107. R. 251, 204–8.

108. R. 251, 298, 380–381.

109. R. 368.

110. PX 12, pp. 19–20, 31–34; R. 251–253, 342, 368, 380–381.

111. R. 379.

112. PX 11.

113. R. 249.

114. PX 12, pp. 34, 35; R. 366–367, 380.

115. PX 12, pp. 19–20.

116. R. 250, 367, 380.

117. R. 250, 367, 380; PX 12, p. 34.

She must have help entering or leaving cars and climbing or descending steps.[118]

36. These multiple, painful and disabling injuries have affected Mrs. O'Toole's life "in every way", so that she doesn't "want to do anything".[119] She does not entertain.[120] She does not visit people and she cannot stand the presence of more than a few people at a time.[121]

37. Hospital and medical expenses paid by Mrs. O'Toole from July, 1950, to November 11, 1952, totaled $8,980.-24.[122]

38. There is no dispute over the amount recoverable for damages as to the O'Toole car. PX 8, page 3, Number 8, shows the value of the Cadillac before the collision was $2,595 and its salvage value after the collision was $510. There was a towing charge of $15. Damages for the car are, therefore, $2,595 plus $15 minus $510, or $2,100.

### Thomas B. O'Toole's Death

39. Mr. O'Toole was generous to his wife.[123] He was a "very dynamic individual with a forceful personality and with an extremely comprehensive knowledge of the mortgage, real estate management and sales and insurance business".[124] His conduct of his business was efficient.[125] He was energetic and worked hard.[126] He made every policy decision in his companies[127] and was the "dynamic feature" behind all their operations.[128] Their earnings were attributable directly to him.[129]

40. O'Toole's capacities and reputation were widely known.[130] He spent much of his time with leaders of industry and business collecting every "scrap of information" useable in his business.[131] His efforts and success can be measured by his knowledge of his business.[132]

### Mr. O'Toole's Health and Life Expectancy

41A. During the period 1946–1949, O'Toole's health was good.[133] O'Toole's family history shows evidence of longevity.[134]

41B. At the time of collision, O'Toole was 54 years of age and Mrs. O'Toole was 57.[135] The Commissioner's Standard Ordinary Mortality Table of 1941 gives O'Toole a life expectancy of 18.48 years and Mrs. O'Toole an expectancy of 16.43 years.[136]

41C. United States Life Tables and Actuarial Table, 1939–1941, published by the Bureau of Census, referred to as Table 38 by the Internal Revenue Service in its use of it for estate and gift tax purposes, gives values of life and remainder interests from which a simple calculation produces the life expectancies used. This Federal Government Table indicates a life expectancy of 18 years for Mrs. O'Toole and 20.2 years for O'Toole.[137]

41D. The latest available table, published by the Society of Actuaries in 1952, called "Annuity Tables, Actuarial Functions", is the only table in evidence which differentiates as to sex and it gives O'Toole a life expectancy of 22.99 years and Mrs. O'Toole an expectancy of 24.59 years.[138]

118. R. 367, 379; PX 12, p. 35.

119. PX 12, p. 35.

120. R. 253, 368.

121. R. 368, 380, 479.

122. PX 28.

123. R. 377.

124. R. 390–391.

125. R. 395.

126. R. 410, 446.

127. R. 441.

128. R. 442.

129. R. 395, 453.

130. R. 395, 443, 447.

131. R. 446, 452, 453.

132. R. 465.

133. R. 355; PX 12, p. 4.

134. PX 12, p. 14.

135. PX 12, p. 2, 3; R. 225–226.

136. PX 8, p. 7, Nos. 26 and 28.

137. R. 188–190.

138. R. 191.

42. Months prior to the accident, on March 22, 1950, O'Toole had a cerebral spasm caused by high blood pressure, essential hypertension.[139] It was not a hemorrhage, occlusion, or stroke.[140] O'Toole's illness was diagnosed and treated by Dr. Douglas Aitken, a defense witness, who specializes as a diagnostician and internist.[141] Hospitalization was not required.[142] The spasm and its symptoms cleared within several hours.[143] Essential hypertension is classified from Grade 1 to 4 according to severity. O'Toole's condition after a searching and thorough medical examination was classified as Group 2, a moderate form, by Dr. Aitken.[144]

43. No other vascular disturbance or injury was found.[145] The tests revealed O'Toole had *not* had high blood pressure "for a very long time".[146] The doctor saw O'Toole at his home for five or six days,[147] at his office on April 5, 1950, and periodically, about weekly, from April 5 until July 7, 1950. Blood pressure readings show that he had improved; his blood pressure on July 7, 1950, was 178 systolic over 86 diastolic,[148] and the patient had lost thirty pounds.[149] The doctor "felt definitely that his blood pressure would come down further." [150]

44. O'Toole, after this illness, stayed at his beach home at Dewey Beach near Rehoboth for longer periods of time, was on a diet, and went to his office later in the morning.[151] Although his activity was restricted, he continued to show some improvement [152] and his doctor was pleased.[153]

45. Defendant offered no medical evidence of the effect of O'Toole's high blood pressure, if any, on his life expectancy.

### Mr. O'Toole's Earning Capacity

46. Maurice A. Massey, Jr., who had knowledge in the field of mortgage financing and real estate sales, management, and insurance, and Herbert A. Melick, a vice-president and director of T. B. O'Toole, Inc., now the executive vice-president, as well as a vice-president and director of Rockford Park Manor, Inc., and O'Toole Realty Co. from 1947 until 1950, testified, *inter alia*, on the issue of O'Toole's earning capacity. In addition, plaintiffs offered as evidence the federal income tax returns of O'Toole, and each of the above named corporations, for the period of 1946 to 1950, inclusive.

47. O'Toole was largely responsible for the earnings of T. B. O'Toole, Inc.,[154] and had O'Toole continued to live,[155] the earned surplus of this corporation, plaintiffs argued, would have increased by $100,000 per year—that is to say, the net earnings after taxes of this company would have equalled $100,000 per year.[156] Of course, the $100,000 per year figure *relates only* to T. B. O'Toole, Inc., and does not include either of the other two corporations or O'Toole as an individual.

48. Melick testified [157] as to the scope of O'Toole's operations, both acting as an individual and through three corporations of which O'Toole was president, director, and sole stockholder.[158] His testimony reveals the numerous stages

139. R. 321.
140. R. 321, 331.
141. R. 330.
142. R. 315.
143. R. 316, 322.
144. R. 319, 333.
145. R. 320, 321, 331, 332.
146. R. 331.
147. R. 323.
148. R. 328.

149. R. 334.
150. R. 334, 335.
151. R. 355, 463.
152. R. 245, 355, 463.
153. R. 334–335.
154. R. 392–395.
155. R. 402.
156. R. 403, 409, 410.
157. R. 442–451.
158. R. 441, 454; DX 1.

at which income was earned by O'Toole in his promotion of numerous single family, multiple dwellings, and commercial developments, as well as in other phases of O'Toole's varied real estate activities in eight states. Massey testified that, in 1950, from the servicing fees on residential mortgages alone, one kind of income described by Melick, earnings were $92,000.[159] That figure does not include income from real estate sales, management, and fire insurance as well as other fees and charges,[160] also described by Melick, which for past years for T. B. O'Toole, Inc., only are shown on PX 27. The size of some of these other fees is illustrated by the fee of $130,000 on a large apartment project in Ohio, earned by O'Toole and paid to T. B. O'Toole, Inc., in 1952 and 1953,[161] after Mrs. O'Toole was forced to sell the assets of the original company.[162]

49. The corporation federal income tax returns show that during the subnormal real estate business years from 1946 until 1950[163] O'Toole earned through the three companies a total net before taxes of $524,934.44,[164] although O'Toole died on July 9, 1950. The individual returns show that for these same 4½ years O'Toole reported income of $195,665.17. The individual returns show net income before taxes of $56,996.29 for 1949 and $39,380.55 for one-half of 1950, the year in which O'Toole died,[165] and Massey testified these were subnormal years.[166]

50. Considering the income tax returns,[167] the letters from Melick to Massey,[168] and according to the testimony of these gentlemen, O'Toole's earning capacity hovered somewhere around $250,-000 per year. These of course are all based on paper figures.

## Mr. O'Toole's Direct Contributions to Mrs. O'Toole

51. Mr. and Mrs. O'Toole lived at 1500 North Broom Street, Wilmington, Delaware, a "long-windowed, high ceilinged, large-doored type of house with three stories and a basement, with a sizable yard" and four baths.[169] O'Toole had renovated, redecorated and modernized this ten-room house and had furnished it "very tastefully and beautifully" with antiques.[170] There were servants, and Mrs. O'Toole always had the use of one of several cars, including a Cadillac and a station wagon, and she had a chauffeur.[171]

52. When they were not elsewhere on trips, Mr. and Mrs. O'Toole spent weekends at Dewey Beach, a summer resort, and Mrs. O'Toole spent all summer there. The several cottages at Dewey Beach were owned and maintained by T. B. O'Toole, Inc.[172] In winter, Mr. and Mrs. O'Toole stayed at a winterized cottage and in the spring and summer at the beach house. Both homes were very sumptuous and equally as well furnished as their Wilmington abode.[173] They also had servants at the beach, and Mrs. O'Toole was furnished transportation when she was there.[174]

53. Over a ten-year period, O'Toole gave his wife jewelry and furs valued on insurance policies at approximately $60,-500 as well as expensive clothes.[175] He

159. R. 405.

160. R. 405.

161. R. 451.

162. R. 417, 483, 484.

163. R. 408, 409.

164. PX 23, 25, 26.

165. PX 24.

166. R. 408–410.

167. PX 23–26.

168. PX 27.

169. R. 348, 372.

170. R. 229, 348, 372; DX 1.

171. R. 230, 348, 349, 372, 373; PX 12, pp. 41–44; DX 1.

172. PX 23; DX 1.

173. R. 232, 233, 373, 374.

174. R. 232, 233, 374, 375.

175. R. 457, 458, 238–242, 352, 376; PX 12, p. 37.

gave Mrs. O'Toole $800 to $1,000 per month in money,[176] although he paid all of their living expenses.[177] O'Toole provided Mrs. O'Toole with additional funds to take one or two trips each year to Portland, Oregon.[178]

54. O'Toole's work caused him to travel extensively, during weekends and for longer periods. His wife accompanied him to do the entertaining and act as hostess.[179] They visited Florida each year for periods varying from one month to three months.[180] These trips were paid for by the corporation, although O'Toole was also allowed substantial deductions for entertainment on his individual income tax returns.[181] This income and other expense account income to O'Toole was not taxable income and does not appear on the tax return summaries introduced by defendant.[182]

55. The measure of damages suffered by Charlotte M. O'Toole as widow of Thomas B. O'Toole under 10 Del. C. § 3704 and the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671 and 2674, is that sum she would have received from her husband during his lifetime, had he lived, reduced to present value, and does not include reasonably expected accumulations to the estate of the deceased husband, accruing thereto had he lived out his normal life span.[183]

(*Comment*: The record here is replete with figures of income earned by corporations owned or controlled by O'Toole. The sum left in his personal estate was substantial. But his business was unique. He was a man who played for the long

chance. That he was a sick man before the accident cannot be refuted. I have, by design, not found as a fact what his life expectancy would have been (reference has simply been made to the expectancy tables). I doubt if the medical profession could either. Hence, my task, as fact-finder, is to do what any juror would do; i. e., examine all the evidence, consider and weigh it, and then arrive at the best figure I can in order to make an award of damages in accordance with the Delaware statutory law.)

## Conclusions of Law

1. It is unnecessary to these findings and conclusions to consider PX 8, Numbers 12, 15 and 18, the admissibility of which defendant contests. DX 3A, 3B, 3C, 5, 10, and 11 may be immaterial but I have considered them, giving them such weight as I think they deserve. Plaintiffs' objections to their admissibility are overruled.

2. Defendant was negligent. This negligence proximately caused the collision and the resulting damages and injuries.

3. Judgment should be entered in favor of Charlotte M. O'Toole against defendant in the sum of $70,000 for her damages and injuries.

4. Judgment should be entered in favor of Charlotte M. O'Toole, as surviving spouse, against defendant in the sum of $400,000 for the death of Thomas B. O'Toole and the loss occasioned thereby.

176. PX 12, p. 36.

177. PX 12, pp. 39–42; R. 231, 353, 354, 375.

178. PX 12, p. 40.

179. R. 481, 482, 378, 373, 230; PX 12, pp. 38–40.

180. R. 481, 351, 243; PX 12, pp. 38–40.

181. PX 23–26; R. 482.

182. R. 549.

183. The most recent Delaware case construing § 3704 is Turcol v. Jenkins, Del., 122 A.2d 224. The formula to arrive at

damages in a widow's death action was there determined. Judge Layton refused to consider, under the particular facts, "expected accumulations", etc., as a factor in determining the quantum of damages. Moreover, he was dealing with a fixed weekly salary which he used with the expectancy tables.

In the case at bar, as the text indicates we are dealing with no fixed income factors; on the contrary, O'Toole's income falls into the realm of the speculative. In short, I (as judge) do as any rational juror does—make my best estimate.

5. Judgment should be entered in favor of Charlotte M. O'Toole, administratrix of the estate of Thomas B. O'Toole and St. Paul Fire and Marine Insurance Company, against defendant in the sum of $2,100 for the damages to the O'Toole automobile.

### Robert J. Wilson's Cause of Action

The findings as to defendant's negligence have been found above. They will not be repeated as to plaintiff Robert J. Wilson. As to his cause of action they are incorporated here. The conclusion is, therefore, Wilson was guilty of no contributory negligence as the driver of the O'Toole Cadillac. Hence, the remaining findings as to him deal with the extent of his injuries and the amount of his damage award.

1. As a result of the collision on July 9, 1950, Wilson's injuries may be summarized:

(1) Compound depressed fracture of the right parital bone.

(2) Cerebral contusion.

(3) Left subdural hematoma.

(4) Right third nerve paralysis with aphasia and ptosis.

(5) Paralysis of all the eye muscles supplied by the third nerve of the right eye, except the superior oblique and the external rectus.

(6) A turning out of the right eye.

(7) Hemianopia or loss of half of the visual field of each eye on the same side.

(8) A transverse fracture of the right patella with slight shattering of the fragments.

(9) Drop foot due to paralysis of muscles of leg and foot.

(10) Atrophy of the right thigh.

(11) Arthritis in the joint of the knee.

2. The first operation performed on Wilson was by Dr. Chipman on July 9 at the Milford Memorial Hospital. The X-rays showed a fracture of the right temporal bone with impression into the brain.[184] Dr. Chipman excised the scalp wound and by blunt dissection separated the galea aponeuratica from the skull. The fractured fragment was elevated and the skin sutured. After the first operation Wilson's condition was "fair".

3. Dr. Philip Gordy (as stated before, a skillful neurosurgeon), examined Wilson at the Milford Hospital and performed a second brain operation on July 10, 1950 because of the severe nature of the fracture and to make certain there was no subdural hemorrhage.[185]

4. Wilson was transferred from the Milford Memorial Hospital on July 12 to the Delaware Hospital in Wilmington, his condition being critical on arrival. By July 29 he began to change and deteriorate.[186] On July 29, Dr. Gordy performed a third operation. A half pint of old blood was found in the subdural space and the brain was depressed one inch beneath the dura. Two trephined openings were also made to permit irrigation. A lumbar puncture was necessary.

5. Wilson's condition remained poor and he did not respond, being in a semicoma. Because of the complexity of this injury: (1) the severe depressed fracture on the one side; (2) the generalized brain contusion; (3) the large subdural hemorrhage, a fourth operation was performed on August 2, 1950. The surface of the brain was inspected and a generalized brain swelling was found.[187]

6. Wilson sustained loss of sense of smell and taste.[188] Wilson was discharged from the hospital on November 17, 1950.

7. Dr. Norman Cutler, an ophthalmalogist, treated Wilson for his eye condition. He examined him on November 3, December 6, 1950, January 15, 1951, and through June when he operated on Wilson on June 26 and examined him thereafter through November, saw him

---

184. PX 13, p. 3.

185. R. 261–263.

186. R. 264.

187. R. 265–70.

188. R. 272.

on several occasions in 1952, in May 1953, and 1954, and on March 15, 1955. When first examined, Wilson suffered from ptosis or drooping of the right eye with vision out of only one eye. When the other lid was open Wilson had double vision. There was an injury to the third nerve causing paralysis, with paralysis of the eye muscles. The nerve is in the base of the brain and would require a severe injury to affect it.[189] The operation in June 1951 was on the external rectus muscle of the left eye to permit Wilson's eyes to become straighter. Wilson was hospitalized for three days. During this period he suffered considerable pain. Following the operation there was still weakness in elevating the right eye. Glasses were prescribed in 1952 with subsequent changes. A slight drooping of the right lid remains which becomes worse on fatigue or abnormal situations.[190]

8. Wilson suffered hemianopia or loss of one-half the visual field on the same side of each eye.[191]

9. Wilson's eye condition appears permanent and he is not industrially employable, and is not in a proper condition to drive a motor vehicle.[192]

10. Dr. Walter Bailey, an orthopedic surgeon, attended Wilson for injuries to his leg. These consisted of a fracture of the right patella, a drop foot or paralysis of the muscle of the leg and foot, atrophy of the right side, and arthritis of the knee. Dr. Bailey saw Wilson on July 10 at the Milford Memorial Hospital. The fracture of the patella was transverse with slight shattering of fragments. Because of Wilson's condition, immobilization was the only treatment given. An operation would have been desirable for removing the fragment, but it could not be done.

11. The drop foot was caused by paralysis of the muscles of the leg and foot, and was treated by a brace with a long bar attached to the shoe.[193] It was necessary to wear the brace until May 1951.[194]

12. Wilson's favoring of his right leg is objective evidence of discomfort in his knee due to the stiffness and arthritic condition in the fractured area. The atrophy affects his ability to walk.[195]

He may require injections of hydrocrotone. The condition appears permanent and painful.[196]

13. Dr. Douglas H. Aitken, a general practitioner, first saw Wilson at the Milford Memorial Hospital, where he was then being administered oxygen. He treated him constantly thereafter. At the Delaware Hospital he treated him for cystitis of the bladder due to the irrigation needed. He had to be given antibiotics to which he developed an allergic reaction as hives. Pain in the leg required codeine.[197]

14. Following the discharge from the hospital, Wilson's mental condition after the brain injury remained the same, then improved slightly, and never improved after that.[198] He developed an extraordinary amount of tension followed by quite severe headaches which still incapacitate him.[199] He requires mild sedatives three to five times a day. He requires supportive therapy.[200]

15. Prior to the collision, Wilson was a normal, healthy person with no serious illnesses or conditions.

16. Wilson started working at the age of sixteen. During the Second World War, at the age of thirty-eight, he worked in a machine shop where he operated a lathe, drill press and shaper, which constituted a precision type of work. Prior

189. R. 438.
190. R. 431.
191. R. 426.
192. R. 438.
193. R. 210.
194. R. 210.
195. R. 215.
196. R. 211.
197. R. 285.
198. R. 286.
199. R. 286.
200. R. 288.

to the accident he was manager of an Auto Service Station, for the Wilmington Auto Sales Company. He met customers well and stimulated business in a satisfactory manner.[201]

17. As a result of the collision Wilson suffered "rather severe intellectual personality changes".[202] He is quite different today.[203] From a mental standpoint he is somewhat confused. Wilson testified he has no sense of smell or taste and does not enjoy his meals. He said he was unable to make decisions and leans on his wife, physician and other members of his family.

18. Wilson, as a result of the collision, no doubt suffered pain and mental anguish. During his hospitalization his condition was serious. He had difficulty in making himself understood; he had to be restrained; he developed sores; he had pain in his injured knee; he had to be force fed; he developed irritation of the bladder; and pressure in his head.

19. At the time of the collision, Wilson was earning $51.50 a week from the Wilmington Auto Sales Company. The Company continued to pay him that sum throughout his entire period of hospitalization and recuperation at home until April 1951. The payments were made and will be made unconnected with his employment and for personal reasons of his employer—because of his long-time employment since 1927 by the Porter family (owner of the Wilmington Auto Sales Company); Mrs. Wilson had worked for the family since 1921, and a brother had been with the company since 1928. Mr. Porter today would not employ Wilson in his present condition, from a business standpoint.

20. At the time of the trial on March 14, 1955, Wilson, under table 38 of the U. S. Life Tables, had a life expectancy of 22.5 years. From July 9, 1950, date of the accident, to March 11, 1955, contains 243 full weeks.

21. Loss of wages to trial equals $12,514.50.

22. Loss of future earnings taking the present weekly value of $1 payable for 1320 weeks, interest compounded annually at the rate of 2½% and multiplied by weekly wage, is $50,495.64.

23. The past medical expenses total $7,110.90 as follows:

| | | | |
|---|---|---:|---:|
| Delaware Hospital | | | $1,464.25 [204] |
| Milford Memorial Hospital | | | 60.65 [205] |
| Dr. Philip D. Gordy | | | 1,235.00 [206] |
| Dr. Lewis Chipman | | | 100.00 [207] |
| Dr. Walter L. Bailey | | | 235.00 [208] |
| Dr. Douglas H. Aitken | | | 855.00 [209] |
| Dr. Norman L. Cutler | | | 225.00 [210] |
| Nurses: | Wanda Cross | $ 351.00 | |
| | Elizabeth McKenzie | 414.00 | |
| | Mary Duncan | 378.00 | |
| | Laura Jenkins | 1,750.00 | 2,893.00 [211] |
| Braces for leg | | | 43.00 [212] |
| Total medical expenses to time of trial | | | $7,110.90 |

201. R. 156–57.
202. R. 276.
203. R. 180.
204. PX 29.
205. PX 29.
206. PX 29, 20.
207. PX 29.
208. PX 29 and 18, R. 212.
209. PX 21, 29.
210. PX 29.
211. PX 29.
212. PX 29.

24. I shall allow no medical or drug expenses for the future as I believe the award for loss of earning power adequately will provide sufficient funds to meet these items.

25. As to pain and suffering for the five years to trial Wilson claims damages of $9,000. Wilson has had a hard time. But, as I observed him on the witness stand he did not impress me as a man who is currently suffering. It would be sheer guess to make him an award "for future pain and suffering" as his counsel urges. How the man is alive is a miracle. Yet he is. And, as I looked at him, it appeared to me that while he may not enjoy a full life he has adjusted himself to life and his environment satisfactorily.

Conclusions of Law (As to Negligence)

1. James F. Griggs was negligent at the time of the collision in that he operated the M–4 tractor in violation of 21 Del.C. § 4137, and in that he failed to give a signal, either audible or otherwise, to the tractor following him as to his intention to slow down and stop. Melvin L. Harrington was negligent at the time of the collision in that he violated 21 Del. C. § 4135, in that he operated his tractor more closely than was reasonable and prudent with regard to the tractor being operated by Griggs.

2. The negligence of Griggs and the negligence of Harrington, both individually and together, were the proximate cause of the collision of Harrington's tractor with the O'Toole Cadillac.

3. Defendant has failed to show any negligence upon the part of Robert J. Wilson, plaintiff, in the operation of the Cadillac motor vehicle.

4. In the alternative, under the facts found, the doctrine of *res ipsa loquitur* is applicable in this case. There is an inference of negligence upon the part of the defendant's employees, and defendant has failed to explain circumstances which would rebut said inferences of negligence. Under said doctrine, the defendant is liable for the negligence of its employees.

(As to Damages)

5. Defendant is liable to plaintiff Robert J. Wilson for all the injuries he suffered by reason of the collision on July 9, 1950, including all his temporary and whatever may prove to be permanent injuries, past medical expenses, past and future loss of wages.

6. Any amounts paid to Mr. Wilson by Wilmington Auto Sales Company following the accident should not be included in computing damages, for whatever Wilson receives from this source is an obvious gratuity.

7. The defendant is liable to plaintiff Robert J. Wilson in the amount of $79,841.04, and judgment should be entered in favor of plaintiff Wilson against defendant for said sum together with costs.