STATE OF MARYLAND for the Use of
Nadine Y. LEVIN, et al., Plaintiff-
Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

STATE OF MARYLAND for the Use of
Sydney L. JOHNS, et al., Plaintiff-
Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

Nos. 14041, 14042.

United States Court of Appeals
Third Circuit.

Argued May 21, 1963.

Decided April 1, 1964.

Rehearing Denied April 28, 1964.

David L. Rose, Atty., Dept. of Justice, John W. Douglas, Acting Asst. Atty. Gen., Gustave Diamond, U. S. Atty., Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Joseph S. Ammerman, U. S. Atty., Morton Hollander, John G. Laughlin, Attys., Dept. of Justice, Washington, D. C., for appellant, Enoch E. Ellison, Washington, D. C., of counsel.

Theodore E. Wolcott, New York City, for appellees.

Before STALEY, HASTIE and SMITH, Circuit Judges.

WIILLIAM F. SMITH, Circuit Judge.

These appeals are from judgments in favor of the use plaintiffs in actions for

wrongful death brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 (b), 2671 and 2674. The deaths resulted from a mid-air collision between a commercial airliner owned by Capital Airlines, in which the decedents were passengers, and a jet trainer plane owned by the defendant and allocated to the Maryland Air National Guard pursuant to § 702(a), 32 U.S.C., and the regulations promulgated thereunder; the collision occurred within the territorial limits of Maryland. The federally owned plane was piloted by one Captain Julius R. McCoy, a rated pilot and a commissioned officer of the Air Guard, employed full time in civilian status as a maintenance technician holding the classified position of Aircraft Maintenance Chief. At the time of the accident the Maryland Air National Guard was not in the active service of the United States.

The trial court found that the sole proximate cause of the accident was "the negligence and wrongful conduct" of the pilot of the federally owned plane. This finding is not challenged here. The trial court also found that at the time of the accident the pilot was acting in his capacity as an "air technician," and, as such, "was a civil employee of the United States acting within the scope of his employment." This finding, on which the respondeat superior liability of the defendant was predicated, is challenged as clearly erroneous and legally unsupportable. We find it necessary to dispose of two preliminary questions before entering upon a consideration of the principal issues raised by these appeals.

PRELIMINARY QUESTIONS.

The plaintiffs argue that under rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A. the trial court's findings of fact may "not be set aside unless clearly erroneous." We do not agree that the "clearly erroneous" test is applicable on the present appeal. The actions were submitted to the trial court on the record made in the consolidated trial of related cases tried in the United States District Court for the District of Columbia. This record consisted primarily, although not entirely, of depositions and written exhibits as to which there was no dispute.

It has been held by this Court, and others, that under such circumstances the findings of fact are reviewable on appeal and need not be given the weight usually accorded them under the rule. Surgical Supply Service, Inc. v. Adler, 321 F.2d 536, 539 (3rd Cir. 1963); Mayo v. Pioneer Bank & Trust Company, 297 F.2d 392, 395 (5th Cir. 1961); Merchants National Bank and Trust Co. v. United States, 246 F.2d 410, 417 (7th Cir. 1957), cert. den. 355 U.S. 881, 78 S. Ct. 148, 2 L.Ed.2d 112 (1957), reh. den. 355 U.S. 920, 78 S.Ct. 339, 2 L.Ed.2d 280 (1958); Lang v. First Nat. Bank of Houston, 215 F.2d 118, 120 (5th Cir. 1954); In Re Kellet Aircraft Corp., 186 F.2d 197, 200 (3rd Cir. 1950); Orvis v. Higgins, 180 F.2d 537, 539, 540 (2d Cir. 1950), cert. den. 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950). We are in as good a position as was the trial court to evaluate the evidence, draw the inferences of which the evidence is reasonably susceptible, and decide the critical questions raised on this appeal.

We note further that the consolidated trial of the related actions resulted in judgments favorable to the plaintiffs therein concerned. These judgments, one of which was reversed only on the issue of damages, were affirmed on appeal to the United States Court of Appeals for the District of Columbia. United States v. State of Maryland, 116 U.S. App.D.C. 259, 322 F.2d 1009 (1963). A petition for a writ of certiorari was denied on December 16, 1963, 375 U.S. 954, 84 S.Ct. 445, 11 L.Ed.2d 314. This denial "imports no expression of opinion upon the merits" of the cases involved, United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923); House v. Mayo, 324 U.S. 42, 48, 65 S.Ct. 517, 89 L.Ed. 739 (1945); Sunal v. Large, 332 U.S. 174, 181, 67 S.Ct. 1588, 91 L.Ed. 1982 (1947), and is therefore of no significance in the instant appeals.

FIRST QUESTION.

The Federal Tort Claims Act imposes liability upon the United States for personal injury or death caused by the negligence or wrongful act or omission of "any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The term "employee of the government," as defined by statute, "includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, * * *." 28 U.S.C. § 2671.

The first and most important question for decision is whether the relationship between the United States and Captain McCoy, in his civilian position as an air technician, was that of employer and employee within the meaning of the statute. The determination of the question requires consideration of the historical origin of the National Guard and the constitutional and statutory provisions under which it is organized, maintained, disciplined and regulated in its peacetime status.

CONSTITUTIONAL AND STATUTORY PROVISIONS.

The respective powers of the federal and state governments with relation to the militia forces are defined by Article 1, § 8 of the Constitution, which provides, in pertinent parts, as follows:

"The Congress shall have Power * * *, to * * * provide for the common Defence and general Welfare of the United States; * *

"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

"To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

* * * [a]nd

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

These provisions established a division of mutually exclusive powers. There was vested in Congress the limited power to enact laws necessary to the effective organization of the militia forces which were deemed necessary to the common defense. There was reserved to the states the right to organize, maintain and regulate such forces and to appoint and commission their officers, a right which existed in and was exercised by the states prior to the adoption of the Constitution. Selective Draft Law Cases, Arver v. United States, 245 U.S. 366, 383, 38 S.Ct. 159, 62 L.Ed. 349 (1918). The quoted clauses made it manifest that the militia units were to remain subject to the control and authority of their respective states until called into the active service of the United States for the special purposes authorized.

The militia forces of the several states are, and, since 1903, have been organized and maintained as units of the National Guard[1] under joint federal-state auspices. Act of January 21, 1903, 32 Stat. 775, commonly known as the Dick Act. However, the first comprehensive exer-

---

1. The organized militia units of the several States and Territories were officially designated as the National Guard, a designation used by many of the states prior to the Dick Act.

cise of the Congressional power was the enactment of the National Defense Act of 1916, 39 Stat. 166, and the amendments contained in the Act of June 4, 1920, 41 Stat. 759.

The cited legislation provided for the reorganization of the Army of the United States, and, as an incident thereto, the organization and training of the National Guard units of the various states on a basis conforming to that of the Regular Army. However, it should be emphasized that both acts specifically declared that the organized Guard was to be a component of the Army of the United States only "while in the service of the United States." There was in each of the acts a specific recognition by Congress of the constitutional limitations on its power. This legislation did not alter the status of the National Guard units as independent military forces subject to the exclusive jurisdiction of the several states, except when mustered into the active service of the United States.

The enactments of 1916 and 1920 authorized the appropriation of funds for the support of the National Guard and the apportionment thereof among the states and territories whose organized units met the standards prescribed by the enactments and the regulations promulgated thereunder by the Secretary of War, a condition precedent to federal recognition. While Congress assumed full responsibility for the financial support of the National Guard units which qualified for federal recognition, it specifically recognized the constitutional authority of the several states and territories to organize, maintain and discipline their respective units under local law.

The statutes also authorized the procurement, at federal expense, of arms, equipment and material, and the issue thereof to the National Guards of the several states and territories upon requisition of their respective governors. As a condition precedent to the allocation of such property, the states were required to make adequate provision for its maintenance and protection. The relevant

sections of the Act, and the amendments thereto, provided that the arms, equipment and material issued were to remain the property of the United States and, further, that the states would be held liable for the loss, damage or the destruction of property due to carelessness or neglect. It is clear that under the statutory plan the possession and control of the allocated property, as well as the responsibility for its care and maintenance in accordance with prescribed standards, were to be committed to the states.

The Acts of 1916 and 1920 were further amended by the Act of June 15, 1933, 48 Stat. 153. The only amendment here relevant (Section 5) established the "National Guard of the United States" as a "reserve component of the Army of the United States," consisting of the "federally recognized National Guard units" of the states. However, the statute did not alter the status of the Guard units or their relationship to the federal government. The amendment specifically provided that "the members of the National Guard of the United States *shall not be in the active service of the United States* except when ordered thereto in accordance with law, and, in time of peace, *they shall be administered, armed, uniformed, equipped, and trained in their status as the National Guard of the several States * * *."* (Emphasis supplied).

The laws relating to the military forces, including the National Guard, were revised and codified by the Act of August 10, 1956, entitled "An Act to revise, codify, and enact into law, title 10 of the United States Code, entitled 'Armed Forces', and title 32 of the United States Code, entitled 'National Guard'." 70A Stat. 1. This initial codification was restricted to the statutes which had become effective prior to March 31, 1955. The statutes which became effective thereafter were incorporated into the codification by the Act of September 2, 1958, 72 Stat. 1437. The purposes of the codification were to restate and clarify the existing laws and to eliminate earlier provisions which had

become obsolete, particularly those contained in the Acts of 1916 and 1920. The substance of the laws was not changed.

The codification defined, as did the earlier legislation, a division of powers consonant with Article 1, § 8 of the Constitution, supra. There was reserved to the states the authority to organize, discipline, train and regulate their National Guard units, as theretofore, but in accordance with standards of training and discipline prescribed by the acts of Congress and the regulations promulgated thereunder by either the Secretary of the Army or Secretary of the Air Force. It is clear from the legislation that compliance with these standards was a condition precedent to the right of the states to federal recognition and subsidization.

### DISCUSSION.

At all times therein relevant, the pilot of the federally owned plane, Captain McCoy, held a dual status. He was a commissioned officer of the Maryland Air National Guard under appointment by the Governor. Maryland Code, Article 65, § 70. As a duly appointed and commissioned officer, he had qualified for federal recognition, pursuant to §§ 305 and 307 of Title 32 U.S.C., and the pertinent regulations, and by reason thereof his military earnings were paid directly from federal funds. We should add that in his military status Captain McCoy was the "aircraft squadron maintenance officer," a position comparable to the one he held in his civilian capacity.

In his civilian status Captain McCoy was a full-time maintenance technician employed by the Adjutant General of the Maryland National Guard, the person designated by the Secretary of the Air Force as the one authorized to employ civilian personnel. 32 U.S.C. § 709(f). He held the position of Aircraft Maintenance Chief and, as such, was responsible for the civilian employees in the Aircraft Maintenance Section[2] and the

care, inspection and repair of aircraft and equipment. Air National Guard Manual (ANGM 40–01), p. 107. On the day of the accident he was "Acting Maintenance Supervisor" and, as such, was responsible for the operation of the Maintenance Division under the general supervision of Lt. Col. Kilkowski, a commissioned officer of the Guard who in civilian status held the position of Base Detachment Commander. Air National Guard Manual (ANGM 40–01), pp. 105 and 106. His civilian salary, like his military salary, was paid directly from federal funds pursuant to statutory authorization.

It was on the basis of the facts summarized in the foregoing paragraph that the court below held that Captain McCoy in his civilian status was an employee of the United States within the meaning of the Federal Tort Claims Act, supra. There is support for this holding in the cases hereinafter considered and upon which the appellees rely.

The appellate courts have uniformly held that the federally recognized members of National Guard units not in active federal service are not employees of the United States within the meaning of the said Act. It has been held that they are employees of their respective states. Williams v. United States, 189 F.2d 607 (10th Cir. 1951); Dover v. United States, 192 F.2d 431 (5th Cir. 1951); McCranie v. United States, 199 F.2d 581 (5th Cir. 1952), cert. den. 345 U.S. 922, 73 S.Ct. 780, 97 L.Ed. 1354; Storer Broadcasting Company v. United States, 251 F.2d 268 (5th Cir. 1958), cert. den. 356 U.S. 951, 78 S.Ct. 916, 2 L.Ed.2d 844; Pattno v. United States, 311 F.2d 604 (10th Cir. 1962), cert. den. 373 U.S. 911, 83 S.Ct. 911, 10 L.Ed.2d 412. But see O'Toole v. United States, 206 F.2d 912 (3rd Cir. 1953).[3] We should emphasize that in each of the cited cases the Court regarded as of no significance the following facts: the Guard

---

2. A section within the Maintenance Division which was under the supervision of the Base Detachment Commander.

3. It was held that members of the National Guard of the District of Columbia were federal employees.

member had qualified for federal recognition, was compensated directly from federal funds, and was in possession and control of a federally owned vehicle involved in the accident which gave rise to claims for personal injury.

These appellate courts have held, also uniformly, that enlisted members of the National Guard, employed in civilian status as maintenance technicians pursuant to federal regulations, are employees of the United States within the meaning of the said Act. United States v. Holly, 192 F.2d 211 (10th Cir. 1951); Elmo v. United States, 197 F.2d 230 (5th Cir. 1952); United States v. Duncan, 197 F.2d 233, (5th Cir. 1952); Courtney v. United States, 230 F.2d 112 (2nd Cir. 1956);[4] United States v. State of Maryland, supra. We emphasize that in each of these cases the Court regarded as significant, and somewhat determinative, the following facts: the maintenance technician qualified for employment under federal regulations, was paid directly from federal funds, and was responsible for the repair and maintenance of federally owned equipment in accordance with prescribed regulations. The courts held that by reason of the regulations under which the maintenance technician was employed and compensated, performed his duties, and was responsible for the maintenance of federally owned property, he was under the direction and control of the United States and therefore its employee.

It is difficult for us to perceive how factors may be considered immaterial in one situation and material in another which is comparable. We are of the view that the rationale upon which the distinction has been held to rest is untenable for the reasons hereinafter discussed.

The Maryland Air National Guard, although federally recognized, was an independent military force of the State under the command jurisdiction of the Governor as "Commander in Chief of the land and naval forces of the State." Maryland Constitution, Article II, § 8, Maryland Code, supra, § 6. The Governor was empowered to make such rules and regulations as were necessary to the appropriate "organization, discipline, training and equipment" of the Guard in conformity with "the National Defense Act,[5] and amendments thereto,[6] and regulations made in pursuance thereof." Ibid. The Air Guard was under the immediate command of an Adjutant General "appointed by the Governor by and with the advice and consent of the [State] Senate." Maryland Code, supra §§ 6, 9 and 10; 32 U.S.C. § 314(a). The Military Department of the State was under the control of a ranking line officer on "active duty status" who, as Quarter Master General, was responsible "for the care, preservation and safekeeping of all military property," including that allocated to the Air Guard by the federal government. Maryland Code, supra, §§ 10 and 11.

The federally owned jet trainer involved in the collision had been purchased for and allocated to the Maryland unit pursuant to § 702 of Title 32 U.S. C., the pertinent provisions of which read as follows:

"(a) Under such regulations as the President may prescribe, * * the Secretary of the Air Force may buy * * * and, upon requisition of the governor of any State * * * issue to its * * * Air National Guard, * * * the supplies necessary to uniform, arm, and equip that * * * Air National Guard for field duty. * *

"(d) No property may be issued to the National Guard of a State * * * unless that jurisdiction makes provision, satisfactory to the Secretary concerned, for its protection and care."

While the plane remained the property of the United States, 32 U.S.C. § 710(a),

---

**4.** But see dissenting opinion of Chief Judge Lumbard.

**5.** Act of August 10, 1956, supra.

**6.** Act of September 2, 1958, supra.

it was committed to the possession and control of the Maryland Guard for its exclusive use.

The plane was loaned to the State of Maryland under statutory terms and conditions which were essentially contractual. The State was granted exclusive possession and control of the craft on condition that it assume full responsibility for its care and maintenance, in accordance with federally prescribed standards, and liability for any loss or damage occasioned by negligence. 32 U.S.C. § 710(c). These conditions were limited to those which were essential to insure the care and protection of property purchased with federal funds. The State could be relieved of its accountability only under the conditions prescribed by statute. 32 U.S.C. §§ 704, 710 and 711.

The employment of Captain McCoy as a maintenance technician was pursuant to the pertinent provisions of § 709(a) and (f) of Title 32 U.S.C., which read as follows:

"(a) * * * Under such regulations as the Secretary of the Air Force may prescribe, funds allotted by him for the Air National Guard may be spent for the compensation of competent persons to care for material, armament, and equipment of the Air National Guard. * * *

"(f) The Secretary concerned shall fix the salaries of clerks and caretakers authorized to be employed under this section, and shall designate the person to employ them."

These provisions vested in the Secretary of the Air Force the right to spend federal funds for the employment and "compensation of competent persons," and the authority to designate the person by whom they were to be employed. There was no other right or authority vested in the Secretary. The statute merely authorized compensation of state employed caretakers from federal funds, an authorization consistent with subsidization.

The person designated by the Secretary, pursuant to subdivision (f), supra, was the Adjutant General of the Maryland National Guard. He was authorized by appropriate regulation "to employ, fix rates of pay, establish work hours (a minimum of 40 hours per week) supervise, and discharge employees within the purview of [the] regulation; subject to the provisions of law and such instructions as may be subsequently issued by the Chief, National Guard Bureau." Air National Guard Regulations (ANGR 40–01). The enumerated functions were exercised by the Adjutant General as the duly appointed representative of the State of Maryland; he was responsible only to the Governor. The right to employ maintenance technicians and other personnel and, as an incident thereto, supervise their work and the manner of its performance, was vested in the Adjutant General, as the representative of the State of Maryland. See Harris v. Boreham, 233 F.2d 110 (3rd Cir. 1956).

The United States Court of Appeals for the District of Columbia Circuit concluded in the companion case, United States v. State of Maryland, supra, 322 F.2d p. 1012, that Captain McCoy "in his civilian capacity as a caretaker of property of the United States" was an employee of the United States within "the terms of the Federal Tort Claims Act." The conclusion appears to be predicated on the same rationale as the earlier cases; in fact, the earlier cases are cited in support of it.

The Court stated, 322 F.2d at page 1013:

"In his property maintenance function he was paid by, and the ultimate right of control over him was in, the United States. The functions lodged by the United States in the State Adjutant General did not serve to supplant this right of control in the United States, though it may be said to have been ancillary thereto. Such supervision as was lodged in the State did not make Captain McCoy an employee of Maryland. * * * There is of course a close relationship between the State of Maryland and the United States in the mainte-

nance of federal property allocated to the Maryland National Guard, but this does not tip the balance toward the State on the issue of employment; for too much begins and remains with the United States in the case of these caretakers of federal property."

We cannot agree with either the conclusion or the tenuous premise upon which it rests.

We have here a classic situation, of which there are many examples,[7] in which the Congress has undertaken the financial support of a state activity in the national interest, on condition that the activity conform to the congressional enactments and the regulations promulgated thereunder. The Congress, consistent with the limited power vested in it by Article I, § 8 of the Constitution, supra, has undertaken to subsidize the National Guard units of the respective states, on condition that they be organized, maintained, disciplined and equipped in accordance with federally prescribed standards.

It is evident that the only purposes of the pertinent statutes, and the regulations promulgated thereunder, were to insure the effective organization of the National Guard and to protect federal funds against unrestricted expenditure, both in the national interest. There is nothing in the legislation which would indicate that it was the intent of Congress to either interfere with the right of the states to organize the Guard or deprive the states of the right to employ, supervise and control such civilian personnel as were deemed essential to the support of the Guard. We are of the view that in their relationships to the United States there is no distinction between a federally recognized member of the Guard and a federally recognized maintenance technician employed in his civilian capacity. A member of the Guard may qualify for federal recognition and compensation from federal funds only if he meets the standards prescribed by federal regulation; a maintenance technician may qualify for employment and compensation from federal funds only if he likewise meets the standards prescribed by federal regulation.

We are of the opinion, and so hold, that at the time of the accident Captain McCoy, in his capacity as maintenance technician, was an employee of the State of Maryland subject to the supervision and control of the Base Detachment Commander, who was in turn under the supervision and control of the Adjutant General. Captain McCoy was not a federal employee within the meaning of the Federal Tort Claims Act, supra.

SECOND QUESTION

However, even if we assume that Captain McCoy, in his civilian capacity, was an employee of the United States, there remains a further question for decision. Was he acting within the scope of his employment as a maintenance technician at the time of the accident? Otherwise stated, was the activity in which he was engaged related to his employment as a maintenance technician and in furtherance of an interest of his alleged employer? The question must be decided under the law of Maryland, the place of the tortious conduct. 28 U.S.C. § 1346 (b); Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Pattno v. United States, supra. The ultimate test is the relation or nonrelation of the tortious conduct to his work as a civilian employee. If Captain McCoy's activity at the time of the accident was within his line of duty as a member of the Guard, the United States cannot

---

7. The Federal Aid Highway Act of 1958, 23 U.S.C. § 101 et seq., under which Congress authorized the expenditure of federal funds and the apportionment thereof among the several states which assumed responsibility for the construction of highways as part of an interstate system of roads; the Hill-Burton Act and the amendments thereto, 42 U.S.C. § 291 et seq., which authorized the appropriation of federal funds and the apportionment thereof among the several states, for the construction of hospitals and similar facilities.

be held liable under the Federal Tort Claims Act. See the cases hereinabove cited.

It is the law of Maryland that an employer may be held liable in damages for personal injury or death caused by the tortious conduct of his employee only if, at the time of the accident, the employee was engaged in an activity in connection with the purposes of his employment and in furtherance of objects within his line of duty. Lewis v. Accelerated Transport-Pony Express, Inc., 219 Md. 252, 148 A.2d 783 (1959); Globe Indemnity Company v. Victill Corporation, 208 Md. 573, 119 A.2d 423, 427 (1956); Eyerly v. Baker, 168 Md. 599, 178 A. 691, 696 (1935). The decisive test of the employer-employee relationship, essential to the creation of liability, is the right of the employer to direct and control the employee at the time and in respect to the very occurrence out of which the accident arose. Greer Lines Company v. Roberts, 216 Md. 69, 139 A.2d 235, 239 (1958); Gallaghers Estate v. Battle, 209 Md. 592, 122 A.2d 93, 98 (1956); Henkelmann v. Metropolitan Life Ins. Co., 180 Md. 591, 26 A.2d 418, 423 (1942). The test is particularly applicable in the instant case.

In his military capacity Captain McCoy was a rated aeronautical officer assigned to the 104th Fighter-Interceptor Squadron of the Maryland Air National Guard. He was a qualified aviator and, as such, was permitted to fly federally owned aircraft when authorized to do so by the Base Detachment Commander. To maintain his level of efficiency and, incidentally, to retain his flying status, Captain McCoy was required by regulation to participate in the prescribed training programs and, in connection therewith, spend a minimum number of hours per year in aerial flight.[8]

These flights were designated as proficiency flights," as distinguished from "functional check flights" which as the term indicates, had a different purpose. The proficiency flights had for their prime purpose training to improve flying skills. The training programs were under the control, supervision and command jurisdiction of the officers of the Maryland Air National Guard, subject only to the requirement that the programs conform to the standards prescribed by the Air National Guard Bureau. 32 U.S.C. § 501; Air National Guard Regulation No. 50–01.

In his military capacity Captain McCoy also held the position of "aircraft squadron maintenance officer." The duties and responsibilities of this post were somewhat similar to those of the maintenance technician. They were carried out under the command jurisdiction of Colonel Kilkowski, as squadron commander, a military post. Captain McCoy testified, as did Colonel Kilkowski, that on every flight the "squadron maintenance officer" would evaluate the performance of the aircraft and report thereon to the appropriate officer. This was admittedly normal procedure even though the flight was one for the "purpose of maintaining flying proficiency."

The accident occurred on Tuesday, May 20, 1958, a day on which Captain McCoy was employed in his civilian capacity. He reported for work at the usual hour and, before taking off on the fateful flight, performed certain administrative duties related to his civilian employment.[9] However, pursuant to arrangements previously made, Colonel Kilkowski authorized Captain McCoy to make a "proficiency flight." The written Flight Order specifically designated the flight as one "for purpose of maintaining flying proficiency." Captain McCoy also

8. The regulations fixed the minimum and maximum number of flight hours. When the maximum number of hours had been accumulated, a flying officer was no longer eligible for flight pay. Captain McCoy was in this situation at the time of the accident. However, the accumulation of

additional hours was relevant to the officer's rating.

9. On the day in question, Captain McCoy was carried in civilian pay status. He had accumulated the maximum hours of flight time for the period and could not qualify for flight pay.

had permission to carry a passenger, a member of the Army Reserve who was interested in joining the Air Guard. It appears from the undisputed testimony that the flight was not a "functional check flight," which is one made in connection with aircraft maintenance, and requires a minimum crew of two qualified men.

At the time of the accident Captain McCoy was engaged in a training flight which was under the control and supervision of the authorized military personnel of the Maryland Air National Guard. He was not acting within the scope of his employment as a maintenance technician but was acting within his line of duty as a commissioned aeronautical officer of the Guard. The fact that he was not eligible for flight pay and was retained in the civilian payroll status is of no relevance.[10] It is similarly of no relevance that in accordance with normal flight procedure he checked the performance of the aircraft and reported thereon. This was his responsibility as "squadron maintenance officer," a military post.

After the accident Captain McCoy, having sustained injury, filed a written notice of claim for the benefits allowable under the Federal Employees' Compensation Act, 5 U.S.C. § 751. This claim was supported by the certificate of Lt. Col. Ebaugh, United States Property Fiscal Officer for the State of Maryland. The certificate stated that Captain McCoy was working "as a Civil Employee of the United States at the time of injury and not as a member of the Maryland National Guard." The claim was approved by the Department of Labor and the benefits allowable under the Act were paid. Whether the claim was properly or improperly approved we need not decide.

The appellees here argue that the certification, coupled with the subsequent approval of the claim for payment, was tantamount to a binding admission that Captain McCoy was a civil employee of the United States at the time of the accident. The argument is untenable for two reasons. An admission such as that made by Lt. Col. Ebaugh, unlike a judicial admission, is in no sense final and conclusive so as to bind the party on whose behalf it was purportedly made. C. H. Elle Construction Co. v. Western Casualty & Sur. Co., 294 F.2d 459, 461, 462 (9th Cir. 1961); State Farm Mut. Auto Ins. v. Porter, 186 F.2d 834, 842 and 843, 52 A.L.R.2d 499 (9th Cir. 1950). The acceptance of the claim for compensation, supported as it was by Lt. Col. Ebaugh's statement, is of no significance. The doctrines of res judicata and equitable estoppel do not ordinarily apply to administrative determinations. Jason v. Summerfield, 94 U.S.App.D.C. 197, 214 F.2d 273 (D.C. Cir. 1954), cert. den. 348 U.S. 840, 75 S.Ct. 48, 99 L.Ed. 662; Niagara Mohawk Power Corp. v. Federal Power Commission, 91 U.S.App.D.C. 395, 202 F.2d 190 (D.C. Cir. 1952), affd. 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 666. This is particularly true where, as here, the administrative determination is subject to review at any time by the agency which made it. 5 U.S.C. §§ 787 and 788.

The judgments of the court below will be reversed and the actions remanded with directions that judgments be entered in favor of the defendant.

HASTIE, Circuit Judge (concurring in result).

■ I agree with Judge SMITH that the flight during which this accident occurred was not an undertaking of a civilian caretaker in performance of his responsibility for aircraft maintenance. Rather, it was a "proficiency flight", a training activity, properly undertaken by Captain McCoy in his capacity as an officer of the Maryland Air National Guard.

---

10. The accumulation of the maximum number of flight hours was not a bar to additional proficiency flights; in fact, it appears from the testimony that the number of hours spent in aerial flight was a factor in the evaluation of a pilot's proficiency and, consequently, his rating.

The fact that any incidental observations this pilot might make concerning the performance of his plane would be communicated to and used by civilian technicians in the servicing or maintenance of the plane did not change the basic character of this training flight. Neither, as I see it, did it matter that the officer flying the plane had a second military responsibility as "squadron aircraft maintenance officer" and a separate and distinct civilian job at the airfield as a caretaker and aircraft technician. We all agree that in his capacity as a National Guard officer, whether functioning as a pilot or as the squadron aircraft maintenance officer, Captain McCoy was not a federal employee within the meaning of the Federal Tort Claims Act. I think it is irrelevant that as a civilian caretaker and mechanic he might put to use the information he had acquired during the performance of one or both of his other responsibilities as a National Guard officer.

The considerations and conclusions stated in the foregoing paragraph are a sufficient basis for reversing the judgment of the district court and requiring the dismissal of this action. Therefore, I do not reach the more difficult and far-reaching question, whether a civilian caretaker and technician, employed as provided in section 709 of Title 32, United States Code, is a federal employee within the meaning of the Tort Claims Act.

I join in the decision reversing the judgment of the district court, but without expressing any opinion upon that portion of the disagreement between my colleagues which concerns the status of civilian aircraft maintenance workers employed to care for federally owned planes while in the custody of National Guard units.

STALEY, Circuit Judge (dissenting).

In my judgment the decision of the majority is erroneous for the reason that it is premised on the resolution of a question which is not germane to the issue in this case. The majority reasons that

constitutional and historical considerations make it manifest that, for the purposes of the Federal Tort Claims Act, members of the Air National Guard are state and not Federal employees. Until today that question had been left open in this Circuit. O'Toole v. United States, 206 F.2d 912 (C.A.3, 1953). In the Second Circuit, see Courtney v. United States, 230 F.2d 112 (C.A.2, 1956). In my view, the United States maintains such control over members of the National Guard even while they have not been called into active service that they are "employees of the Government" within the meaning of the Federal Tort Claims Act. But I leave that question to another day, for, as the majority states, "The first and most important question for decision is whether the relationship between the United States and Captain McCoy, *in his civilian position as an air technician*, was that of employer and employee within the meaning of the statute." (Emphasis supplied.) On this question, historical and constitutional considerations as to the status of members of the National Guard are simply not relevant. For we are concerned with the status of Captain McCoy, not as a member of the National Guard, but as a civilian caretaker or air technician employed under 32 U.S.C. § 709(a) "to care for material, armament, and equipment of the Air National Guard * * *" which is property of the Federal Government.

On this, the vital question in this case, the majority candidly admits that each and every one of the reported cases is arrayed against it, for each of them holds that when acting in this capacity such a caretaker is an "employee of the Government" within the meaning of the Federal Tort Claims Act. See the cases cited in the majority opinion.

The undisputed evidence in this case makes it abundantly clear that in addition to his duties as a member of the Air National Guard, Captain McCoy was employed as a civilian maintenance technician pursuant to 32 U.S.C. § 709. Indeed, the record shows that the major

portion of his salary resulted from his employment in this capacity, and that he was so employed on the very day of this tragic accident. Pursuant to § 709(f), his salary was fixed by the Secretary of the Air Force, who had designated the Adjutant General of the Maryland National Guard to employ him. Thus, in this capacity, McCoy was employed under Federal law, received his pay from Federal funds, cared for Federal property, and his duties were fixed by Federal regulation. As the Court of Appeals for the District of Columbia has held with respect to this very individual in companion suits brought by the survivors of others killed in this catastrophe, "In his property maintenance function he was paid by, and the ultimate right of control over him was in, the United States." United States v. State of Maryland, for the Use of Meyer, 116 U.S.App.D.C. 259, 322 F.2d 1009, 1013 (C.A.D.C.), cert. denied, 375 U.S. 954, 84 S.Ct. 445, 11 L.Ed. 2d 314 (1963). For an excellent exposition of these and additional factors which compel the conclusion that a caretaker is an employee of the Federal Government, see Elmo v. United States, 197 F.2d 230 (C.A.5, 1952), and United States v. Holly, 192 F.2d 221 (C.A.10, 1951). We specifically approved the rationale of Holly in O'Toole v. United States, 206 F.2d at 916. Thus, the effect of the majority's decision is to overrule our decision in that case.

The majority finds it difficult to perceive how the incidents of employment I have mentioned are material in considering McCoy's employment status as a civilian caretaker, but are not decisive in determining his employment status as a member of the National Guard. I have no such difficulty. There can be no question but that these indicia of employment represent significant, if not conclusive factors, in determining the employer-employee relationship. See National Labor Relations Board v. Howard Johnson Co., 317 F.2d 1 (C.A.3, 1963), cert. denied, 375 U.S. 920, 84 S.Ct. 264, 11 L. Ed.2d 164 (1963). Hence, in ordinary circumstances, members of the National Guard would be considered Federal employees because substantial elements of control over them are vested in the United States. However, because of the constitutional provision with respect to the militia, several cases have held that members of the National Guard who have not been called into active service are state and not Federal employees. See the cases cited in the majority opinion. I have already indicated my disagreement with that conclusion. But, in any event, there is no such constitutional or statutory provision with respect to civilian caretakers. Accordingly, in determining their employment status, an analysis of the incidents of employment is of critical significance. As has been previously indicated, such an analysis of McCoy's status as a civilian caretaker of Federal property leads to the ineluctable conclusion that, in this capacity, he was an employee of the United States.

The majority states that as a full time maintenance technician McCoy was "employed by the Adjutant General of the Maryland National Guard." But this observation is not persuasive, for under 32 U.S.C. § 709(f), "[t]he Secretary concerned shall fix the salaries of clerks and caretakers authorized to be employed under this section, and shall designate the person to employ them." Thus in employing McCoy the Adjutant General was merely acting as the designee of the Secretary of the Air Force. As was stated in United States v. State of Maryland, for the Use of Meyer, 116 U.S.App.D.C. 259, 322 F.2d at 1013:

> "* * * The functions lodged by the United States in the State Adjutant General did not serve to supplant this right of control in the United States, though it may be said to have been ancillary thereto. Such supervision as was lodged in the State did not make Captain McCoy an employee of Maryland. A foreman, for example, is not the employer of the one whose work he may in some respects supervise. There is of course a close relationship between the State of Maryland and the

United States in the maintenance of federal property allocated to the Maryland National Guard, but this does not tip the balance toward the State on the issue of employment; for too much begins and remains with the United States in the case of these caretakers of federal property."

In this setting, to hold that McCoy was a state and not a Federal employee for the purposes of the Federal Tort Claims Act is to thwart the remedial purposes for which that statute was enacted.

The majority also concludes that, assuming that Captain McCoy in his civilian capacity was an employee of the United States, he was not acting within the scope of his employment as a maintenance technician at the time of the accident. The plain answer to this conclusion is, as the Government concedes in its brief, that it is contradicted by the undisputed testimony of both Captain McCoy and his commanding officer. The testimony of the commanding officer who gave permission for the flight in question was given at the trial of the companion case in the District of Columbia. That testimony was made a part of the record in this case by the agreement of the parties.[1] As indicated in the opinion of the Court of Appeals for the District of Columbia, the commanding officer testified as follows:

"A. The general reason for any flight of this nature is proficiency. You don't set up a flight for the express purpose of taking any individual up, the express purpose for flying is for your own general pro-

ficiency. If there is a seat available and a man qualifies in accordance with the regulations, it is permissible to take him up on that flight. The Air Force does it all the time.

"Q. Were there other reasons for the flight in question?

"A. I think as I mentioned before, a third reason for any flight is to insure that the equipment is in proper working order, to—well, as a result of each flight the maintenance officer takes, he has to fill out a form, whether the aircraft was okay, or whether it had even minor discrepancies which would be listed in the form. When he lands and comes back from the flight, this is done; so there is a third reason for the flight, which is to insure the proper maintenance of the equipment which he has general supervision over.

"Q. As an aircraft technician?

"A. As an aircraft maintenance officer in the squadron and also as an air technician." United States v. State of Maryland for the Use of Meyer, 116 U.S.App.D.C. 259, 322 F. 2d at 1012.

The testimony of Captain McCoy is to the same effect. Certainly, in the light of this uncontroverted evidence, I cannot say that the district court erred in concluding that Captain McCoy was acting within the scope of his employment as a maintenance technician at the time of this accident.

I think that no more need be said; I would affirm the judgment of the district court.

1. In that portion of its brief describing the proceedings in the district court, the Government relates that:

"The evidence at the trial on that issue consisted of the testimony of Captain McCoy, and his commanding officer, Lt. Col. Kilkowski, and others, and numerous exhibits and depositions, including the deposition of Major General Winston P. Wilson of the Arkansas Air National Guard, who has been on active (Federal) duty in the National Guard Bureau of the Department of Defense as the Assistant Chief for the Air National Guard. Both Captain McCoy and Lt. Col. Kilkowski testified that in their opinions they believed that Captain McCoy was performing duties in his civilian capacity as well as his military capacity, at the time of the accident."