STATE OF MARYLAND, for the Use of Mary Jane MEYER, etc., et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

STATE OF MARYLAND, for the Use of Vance Lewman BRADY, etc., et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

CAPITAL AIRLINES, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 1236–59, 1237–59, 1238–59.

United States District Court
District of Columbia.
June 30, 1966.

---

8. In re Woodruff, 9 Cir. 1941, 121 F.2d 152, cert. denied Lynch v. Jackson, 314 U.S. 652, 62 S.Ct. 99, 86 L.Ed. 522.

See also D.C., 229 F.Supp. 280, 121 U.S.App.D.C. 258; 349 F.2d 693.

Richard W. Galiher, Washington, D. C., and Louis G. Davidson and Peter McBreen, Chicago, Ill., for plaintiffs.

Wallace E. Maloney and John F. Murray, Dept. of Justice, and William Crawford, Asst. Gen. Counsel, Federal Avia-

tion Agency, Washington, D. C., for defendant.

Richard W. Galiher, of Washington, D. C., and Louis G. Davidson and Peter McBreen, of Chicago, Illinois, for the plaintiffs.

Wallace E. Maloney and John F. Murray, Department of Justice, Washington, D. C.; and William Crawford, Assistant General Counsel, Federal Aviation Agency, Washington, D. C., for the defendant.

HOLTZOFF, District Judge.

The Court has before it three actions consolidated for trial, which have been brought against the United States under the Federal Tort Claims Act to recover damages for wrongful death and destruction of property resulting from a collision between a Viscount airplane of a commercial type, owned and operated by Capital Airlines Company, Inc., the plaintiff in one of these actions, and a jet airplane known as T–33, owned by the United States.

The collision took place on the morning of May 20th, 1958, near Brunswick, Maryland. The Viscount airplane, owned and operated by the plaintiff Capital Airlines Company, was on a regular scheduled commercial flight, known as Flight 300, from Pittsburgh to Friendship Airport, which is located near Baltimore, Maryland. It was proceeding in a regular controlled airway assigned to commercial traffic known as Victor Airway 44 and was carrying a number of passengers. Of the three consolidated actions, two were brought in behalf of the estates of the pilot and the co-pilot of the Viscount airplane respectively, to recover damages for wrongful death, and the third was brought by Capital Airlines to recover damages for the destruction of its aircraft. The Viscount airplane was at all times in communication with traffic control stations maintained by the Civil Aeronautics Authority, now known as the Federal Aviation Agency, and was strictly and closely following directions that it received periodically from the Control Center.

On the same morning the Government jet airplane known as T–33, a craft of much smaller size than the Viscount, was being flown on a training flight from a military airfield near Baltimore. It had progressed to approximately Harpers Ferry and had turned around and was returning to its station. It was flying considerably faster than the Viscount and in the same direction. It was gradually overtaking the Viscount. When the two airplanes were substantially over Brunswick, Maryland, which was on the direct route followed by the Viscount, the jet airplane was suddenly turned to the right by its pilot, for some reason that has not been explained, and the right tip-tank of the Government airplane struck the Viscount on its left side at a point slightly aft of the cockpit. The two airplanes came together at an angle of approximately 45 degrees. Both airplanes were wrecked. The occupants of the Viscount were killed. The Government pilot fortunately parachuted to safety

A brief summary of the prior proceedings in these cases, which have been somewhat unusual and exceptional, seems desirable. At the time of the unfortunate accident the Government plane and its pilot were on assignment to the Maryland National Guard. A preliminary issue was raised by the Government, whether the Air Force officer who was the pilot of the Government plane, was at the time of the collision acting in the scope of his employment by the United States. By an order made by the Court this issue was tried separately, before another Judge, and was resolved against the Government; namely, it was held that the pilot of the T–33 was at the time of the collision engaged in the performance of the duties of his employment by the United States and that consequently the United States was liable for his negligence, if any existed, on the theory of respondeat superior.

The case was then tried on the merits before this Court. It was found that the pilot of the Government plane was guilty of negligence, that his negligence was a proximate cause of the disaster, and that

the pilot of the Viscount had been free of contributory negligence. Judgment was accordingly rendered against the United States in favor of each of the three plaintiffs, in the aggregate sum of $249,000 in favor of the estate of Vance Lewman Brady, who had been the pilot of the Viscount, and in the aggregate sum of $171,000 in favor of the estate of Paul Frank Meyer, who was the co-pilot of the airplane. In accordance with the pertinent Maryland law, the total amounts awarded to the two estates were allocated as between the dependents of the deceased who were entitled to portions of the recovery. A judgment was also rendered in favor of Capital Airlines for the value of the destroyed aircraft for the sum of $1,216,050. These judgments were entered on December 6th, 1961.

The judgments were affirmed by the Court of Appeals for the District of Columbia Circuit except as to the amount of damages awarded to Capital Airlines and the case was remanded for a reconsideration of that item of damages. United States v. State of Maryland, 116 U.S.App.D.C. 259, 322 F.2d 1009. The case was heard again by this Court solely on the issue of damages to be awarded to Capital Airlines and the amount awarded was changed by a judgment entered on October 11th, 1963, to $1,086,050. This judgment was affirmed, United States v. Capital Airlines, Inc., 120 U.S.App.D.C. 195, 345 F.2d 89. Certiorari was denied by the Supreme Court, 375 U.S. 954, 84 S.Ct. 445, 11 L.Ed.2d 314.

In the meantime, actions in behalf of the estates of some of the passengers that had been killed in the wreck were brought in the Western District of Pennsylvania and likewise resulted in judgments in favor of the plaintiffs. The Court of Appeals for the Third Circuit, however, reversed the judgments on the ground that the pilot of the Government plane had not been acting as an employee of the United States at the time of the crash and that hence the United States was not liable for his negligence. State of Maryland for Use of Levin v. United States, 3 Cir., 329 F.2d 722. On certiorari the Supreme Court affirmed the judgment of the Third Circuit. Maryland for the Use of Levin, v. United States, 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205. The effect of this decision, which was rendered on May 3rd, 1965, was to sustain the ruling of the Third Circuit that the pilot of the T-33 was not to be deemed a Government employee at the time of the flight and, therefore, that the United States was not liable for his negligence.

Although the time for filing a petition for rehearing of the petition for certiorari in the present cases had long expired, the Supreme Court, nevertheless, on motion of the United States, reopened the matter, granted a rehearing and reversed the judgments to which reference has already been made. The plaintiffs, however, pointed out to the Supreme Court that at the trial they had pressed only the charge of negligence asserted against the pilot of the Government plane and that the charges of negligence against Government personnel in the Control Center that had been assisting in guiding the commercial aircraft had not been tried. Consequently, the Supreme Court made a somewhat unusual order, which, in addition to reversing the judgments, remanded the cases to this Court for disposition of the unresolved issues. The present trial has been had in accordance with this order of remand made by the Supreme Court.

The only issues that are open for consideration at this time are obviously what the Supreme Court termed as the unresolved issues. The prior finding that the pilot of the Government plane was guilty of negligence which was a proximate cause of the accident stands. So does the finding that the pilot of the Viscount was free of contributory negligence. It is claimed in behalf of the plaintiffs that in addition, the Government employees operating the Washington Control Center, from which the Viscount plane was being guided, were also negligent and that their negligence was

likewise one of the proximate causes of the accident. This is the issue tried at this time. It is, of course, well settled that injuries or damages may be the consequence of the concurring negligence of two or more persons and that the negligence of each may be a proximate cause of the result. Under such circumstances, each negligent person, or his employer, as the case may be, is liable for the total damages.

Specifically, the issue presented at this trial is whether the personnel at the Washington Control Center should have detected the approach of the T–33 on their radarscope and should have warned the pilot of the Viscount of the danger of a collision, thereby enabling him to take immediate steps to avoid the disaster. To put this issue in somewhat different form, it was as follows: Was the T–33 visible on the radarscope at the appropriate time; and, if so, should it have been detected; and, if so, should the information have been immediately communicated to the pilot of the Viscount plane?

The Viscount was flying under what are known as instrument flight rules. They require the pilot to file a flight plan in advance with the proper Government station of what was then known as the Civil Aeronautics Administration and is now called the Federal Aviation Agency. The plan must be cleared by the Government station before the plane takes off. While in flight the pilot is in continuous radio communication with the proper regional Government station known as a Traffic Control Center. In this instance the Washington Traffic Control Center, located at the Washington National Airport, was in charge shortly prior to and at the time of the collision. The aircraft is being observed on the radarscope at the Center. Instructions as to changes of elevation and direction are continuously communicated to the pilot by the controller at the Center. In addition, information may be relayed to the pilot concerning obstructions and other airplanes in his vicinity that may possibly constitute a hazard.

The Government plane was being flown by what are known as visual flight rules. Such a flight is not subject to the direction of any Government Control Center and a plane proceeding in this manner is under no obligation to inform the Control Center that it is about to embark on a flight, nor is it obligated to announce its destination. In addition to giving appropriate signals or directions from time to time to aircraft flying on instrument flight rules, it is also the duty of the employees of the Control Centers to use due diligence to observe and detect on the radarscope any traffic flying on visual flight rules and other obstructions in the vicinity of the aircraft that is being controlled and immediately to warn the pilot of any impending danger. While this duty is not absolute and does not mean that the Government is an insurer of safety, nevertheless due care must be exercised to discharge it adequately. What constitutes due care under any circumstances necessarily depends in large part on the risk and hazard involved.

With commendable candor Government counsel stated that if the controller had detected a target on the radarscope that he felt was a hazard to an aircraft under control, he should have given that information to the Viscount aircraft. It has been held that the failure of a controller at a Control Center to perceive such other traffic and to warn the pilot of a controlled aircraft of the traffic, or of its approach, may constitute negligence for which the United States is liable under the Federal Tort Claims Act. Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62; United Air Lines, Inc. v. Wiener, 9 Cir., 335 F.2d 379.

The situation here presented is somewhat analogous to that considered by the Supreme Court in Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48. In that case suit was brought against the Government for damage to a vessel sustained by reason of negligence in the maintenance of a lighthouse. The Supreme Court held

that while the Government was under no legal obligation to maintain a lighthouse or undertake a lighthouse service, once it had exercised its discretion to do so, it was obligated to use due care in operating the lighthouse. The Supreme Court stated pointedly on page 69, 76 S.Ct. on page 126:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light * * * and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; * * *"

■ It is claimed by Government counsel that the primary duty for the safety of his aircraft rests on the pilot. There is obviously no doubt that the pilot is under an obligation to use a high degree of care and vigilance in navigating his airplane. This obligation, however, does not detract from the reciprocal duty devolving on other persons, such as the controllers in the Traffic Control Center. As has been already stated, negligence of two or more persons may concur in causing an accident, and in that event each is liable for the result.

Immediately before the collision the Viscount was flying in the center of the airway, descending toward an elevation of 7000 feet. According to the pilot of the Government plane, his aircraft was at an elevation of 5000 feet when it made the turn at Harpers Ferry and was steadily climbing until it reached a height of about 8000 feet immediately before the crash. The distance between the antenna at the Washington National Airport and the area of the collision was slightly over 40 miles, well within the range of vision on the radarscope at that elevation. The weather was excellent and the atmosphere was clear.

The plaintiffs claim that the Government Controllers Laymon and Floyd should have perceived the T–33 on the radarscope in time to have warned the Viscount of the presence of the other aircraft, and that failure to do so was actionable negligence that constituted a proximate cause of the catastrophe. The plaintiffs' expert Cockerman expressed the opinion that according to his calculations the T–33 should have been visible on the radarscope at the Washington Traffic Control Center for at least one minute and 20 seconds and possibly even as much as two minutes before the collision. The plaintiffs' expert McDermott expressed the view that the T–33 should have been apparent on the radarscope for about 80 to 100 seconds prior to the collision and that a minimum of 80 seconds elapsed during which a warning could have been given. In that event, McDermott testified that the pilot would have had ample time to ascertain the location of the other traffic and avoid the accident. While these intervals of time seem very brief at first blush, the testimony is that controllers and pilots are specially trained to observe, decide, and react rapidly.

Laymon was the controller who was guiding the flight of the Viscount on the fatal morning from about 10:14½ a. m. He had no other airplane under his supervision at the time and was observing only this aircraft and operating the radar only on the frequency used by the Viscount. As was just stated, the plane came within his zone at about 10:14½ a. m. The crash occurred at 10:29 a. m., about 15 minutes later. During the intervening period Laymon left for three or four minutes for personal reasons and temporarily turned over the control to his co-worker Floyd, who was covering the area immediately adjacent to his. During Laymon's absence Floyd was thus required to cover two posts and watch two sectors. When Laymon returned to his post the Viscount was plainly visible on the radarscope. This is not disputed. The radar was operating well. Shortly thereafter Laymon observed another image or target, to use the term of the industry, on the radarscope. It promptly appeared to Laymon that there was a possibility that this additional image was that of another airplane. He asked Floyd whether the latter had notified the Viscount concern-

ing the possible presence of visual flight rules traffic in the vicinity. Floyd answered in the negative. Laymon then tried to reach the Viscount on the radio, but it was too late. The catastrophe occurred at that moment.

Laymon claimed that the image in question was very faint. Floyd asserted that he did not see it at all. While faint, it was evidently sufficient for Laymon to discern it and to entertain the thought that it possibly represented another aircraft concerning which the pilot of the Viscount should be warned. His inquiry to Floyd, followed by his own action that unfortunately proved tardy, inescapably leads to the conclusion that the appearance of another airplane, which proved to be the T–33, was sufficiently visible to a trained eye and that a warning of its presence could and should have been immediately transmitted by radio to the pilot of the Viscount.

Laymon testified that he had returned and was watching the radarscope for some time before he observed this additional image and that immediately thereafter he started to warn the Viscount. His pointed inquiry to Floyd, however, would be meaningless unless he had seen the image prior to the moment when he claims to have first observed it. Why ask Floyd whether the latter had given warning to the Viscount if Laymon had not seen the image previously to that instant? Laymon's inquiry to Floyd is strong circumstantial evidence that he had seen the image in sufficient time to have given warning to the Viscount and that he actually observed it earlier than he claims to have done. This inference is strongly corroborated by the two experts of the plaintiffs, whose testimony has already been discussed, according to one of whom the T–33 should have been apparent on the radarscope about 80 to 100 seconds prior to the collision, and according to the other the interval should have been as long as at least one minute and 20 seconds,—in either event, fully ample to have given warning.

An instant's inattention, a moment's hesitation, stood between safety and disaster. Failure to see and realize what was visible and discernible, followed by failure to give immediate warning, constituted negligence that was one of the proximate causes of the accident. It was negligence concurrent with that of the pilot of the Government plane. Each constituted one of the proximate causes of the collision.

The Government tried to justify the failure of the personnel in the Control Center by expert testimony to the effect that airplanes of the T–33 variety present a faint and uncertain image on a radarscope, which at times appears and then may fade from view. They would have the Court infer that on this occasion the image may not have appeared at all or may have faded immediately after its first appearance. The fact remains, however, that Laymon made the crucial inquiry of Floyd whether the latter had warned the Viscount of visual flight rules traffic. Evidently Laymon had seen an image that aroused his concern and caused him to make this immediate inquiry. Otherwise, it would have been unreasonable for him to ask this question.

The facts and circumstances overcome possible inferences that might be drawn from opinion testimony that applies generally and not necessarily to any one particular moment. Moreover, even this expert testimony was somewhat weakened by the concession on the part of one of the Government experts that in fact all jet airplanes produce images that are smaller and weaker than those of propeller planes. This opinion was further weakened by evidence that on the day following the accident a test flight over the general area was made by Government personnel in another airplane. One of the purposes of the test flight was to determine whether the radar was operatig properly and the scope of its vision. The observations made on this flight are recorded in an exhibit introduced at the trial. One of the entries on this exhibit shows that in the area covered by the flight there were no blind spots; that at the altitude of 4000 feet the radar-

scope had a line of vision of 36 nautical miles; at the altitude of 5000 feet, 41½ nautical miles; at the altitude of 6000 feet, 48½ nautical miles; at the altitude of 7000 feet, 51 nautical miles; and at the altitude of 8000 feet, 55 nautical miles. Immediately prior to the collision it will be recalled that the T–33 was climbing up to 8000 feet. At that height the range of vision of the radar was 55 nautical miles, far greater than the distance between the point of impact and the Washington National Airport.

A somewhat similar state of facts was presented in a case to which reference has already been made, Eastern Air Lines, Inc. v. Union Trust Co., 95 U.S. App.D.C. 189, 221 F.2d 62. That case involved a collision between a passenger airplane and a private airplane near the Washington National Airport. One of the findings of fact made by the Trial Court which formed the basis of a judgment against the United States, was that there had been a failure of the Control Tower personnel to issue a timely warning to the Eastern Air Lines plane as to the presence of a P–38 on final approach and in the failure also to warn the P–38 that Eastern was on final approach. The Court of Appeals affirmed the judgment against the Government rendered by the District Court.

Another case that is somewhat similar has also been already referred to, United Air Lines v. Wiener, 335 F.2d 379, 396, decided by the Ninth Circuit. In that case it was held that the failure of the Civil Aeronautics Administration to notify the United Air Lines of the existence and utilization of a certain military flight procedure in the airway through which the United Air Lines plane was flying constituted negligence for which the Government was liable and that this negligence was one of the causes of the disaster to the airplane of United Air Lines.

The Court concludes that the Government personnel at the Washington Traffic Control Center, acting within the scope of their Government employment, were guilty of actionable negligence in failing to observe sufficiently the presence of the T–33 in the vicinity of the Viscount and to transmit timely warning of its presence to the pilot of that craft.

The Court further concludes that this negligence was a proximate cause of the deaths of the two plaintiffs' intestates and of the destruction of the plane of Capital Airlines, for which the United States must be held liable.

Accordingly, the judgments heretofore entered in favor of the estates of the pilot and the co-pilot and in favor of Capital Airlines Co., Inc., to which reference has already been made, are hereby reinstated.

This decision will constitute the findings of fact and the conclusions of law, but counsel, if they see fit to do so, may submit for the consideration of the Court additional proposed findings and conclusions of law.

You may submit a proposed judgment.